ROTH STEEL TUBE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6999–74. Filed May 23, 1977.

*Bennet Kleinman* and *Laurence Glazer,* for the petitioner.
*John P. Graham,* for the respondent.

DAWSON, *Chief Judge:* Respondent determined a deficiency of $85,755 in petitioner's Federal income taxes for the taxable year ended April 30, 1972. Such deficiency resulted from the disallowance of petitioner's claimed addition to its bad debt reserve in the amount of $178,656. The two issues presented for decision are:

(1) Whether petitioner properly charged its reserve for bad debts in the amount of $172,443 in connection with the partial writeoff of an account receivable from a debtor corporation which was acquired as a subsidiary by petitioner.

(2) Whether an additional amount of $6,213 is deductible as a reasonable addition to petitioner's reserve for bad debts.

## FINDING OF FACT

Some of the facts have been stipulated and are so found.

Roth Steel Tube Co. (hereinafter referred to as petitioner) is an Ohio corporation with its principal office in Cleveland, Ohio. It filed its Federal corporation income tax return for its taxable year ended April 30, 1972, with the District Director of Internal Revenue in Cleveland. Petitioner is a manufacturer and supplier of steel tubing.

During 1971 and for approximately 15 years prior thereto, petitioner supplied steel tubing to Remco American, Inc., a toy manufacturer located in Wilkes-Barre, Pa. By 1971, Remco American was one of petitioner's three or four largest customers, accounting for approximately $500,000 to $1 million in annual sales. As of January 21, 1971, Remco American owed petitioner approximately $283,000 with respect to purchases in the ordinary course of its business. As of April 30, 1971, such balance was approximately $327,500.

Until April 30, 1971, Remco American was a wholly owned subsidiary of Remco Industries, Inc., another toy manufacturer, located in Harrison, N.J. Both Remco American and Remco Industries had been experiencing financial difficulties. On January 21, 1971, Herbert Gurbst, a principal officer of Remco American, met with officials of Remco Industries who advised Gurbst that Remco Industries had, earlier that day, filed a petition for an arrangement under chapter XI of the Bankruptcy Act, and that they also planned to file such a petition for the subsidiary, Remco American. Gurbst, however, convinced these parent company officials that Remco American was a viable entity, that he should be given a chance to solve its financial problems, and that a bankruptcy petition should not be filed for Remco American.

Immediately thereafter, Gurbst began a concentrated three-pronged effort to save Remco American. This effort included arranging short-term financing to enable operations to continue, contacting major creditor-suppliers to arrange for continued delivery of supplies, paid for on a current basis, but with a moratorium on payment of large past due balances, and seeking a financially sound company to purchase Remco American from Remco Industries. Gurbst considered it critical that the latter steps be accomplished as soon as possible because the company's potential customers (toy

retailers) would be reluctant to place large orders for Christman delivery with a company on the verge of bankruptcy. His efforts continued through April 1971.

During this period Gurbst contacted several of Remco American's largest creditors, including petitioner. Gurbst advised these creditors that unless they were willing to accept a substantial discount in settlement of their past due balances, it would be impossible to avoid bankruptcy and impossible to arrange for a sale of the company. Although there were some potential buyers of the company, they were unwilling to take over all of its liabilities when they might be able to acquire the same business without such liabilities after bankruptcy proceedings. Most of the large creditors, including petitioner, desired to avoid bankruptcy proceedings, and to see Remco American survive so that it could continue as a substantial customer in the future. Thus, most of them were receptive to the idea of settling their claims at a discount, provided that the others would agree to do so as well, so that Remco American could remain in business.

Petitioner was Remco American's largest creditor. Throughout the period of his efforts to save Remco American, from January through April of 1971, Gurbst was in regular contact with Leonard Roth, then president of petitioner, to keep him apprised of Remco American's progress. On April 1, 1971, Leonard Roth wrote the following letter to Gurbst:

Dear Herb,

In response to your letter of March 29th, I would like to advise you of my feelings in the matter.

Having done business with you for 15 years, I certainly want to be of any help I can. You are asking me to sacrifice a lot of money by taking some kind of settlement. I would agree with several conditions.

(1) I will accept the 32½% settlement if I get it on or before June 1, 1971 and payment in full by certified check.

(2) I will only accept it if you assure me that you will be involved in the management of whatever company exists that is now called Remco American.

(3) My only hope of getting back the money I am sacrificing is the continuation of your operation and having you as a customer.

If this is acceptable to you, and the people you are talking to, use this letter as your authority to quote me on the 32½% settlement. Best of luck.

Yours truly,

(S) Len

LEONARD ROTH

Gurbst then contacted the other major creditors, advised them that petitioner, the largest creditor, had agreed to accept a 32½-percent settlement, and requested their cooperation on the same basis. He also used Roth's letter in his ongoing efforts to find a potential purchaser of Remco American.

Although Gurbst had pursued several potential purchasers for Remco American, by mid-April he had still not been able to arrange a sale. In a telephone conversation on April 14, 1971, Roth and Gurbst discussed the possibility of petitioner's acquiring Remco American, and on April 15, 1971, Gurbst wrote Roth the following letter:

Dear Len:

Re our conversation of yesterday, I think that what you said on the phone about the possibility of you buying Remco American would be the best of all situations.

There is, however, one serious problem. That is, now that your 32½% acceptance is on file, I think you would have to honor it even if you bought the company.

I feel that I could save about an additional $100,000 to $150,000 from your creditors based on your acceptance of the 32½% settlement.

Please call me at once.

Very truly yours,

REMCO AMERICAN, INC.

(S) Herbert

HERBERT S. GURBST

*Vice President*

During the last 10 days of April 1971, Gurbst received written settlement agreements from several of Remco American's larger creditors, including the following:

*Potlatch Forests, Inc.*—Agreed to accept 50 percent of $101,415.43 balance if paid by May 14, 1971, and with the understanding that Gurbst would be employed as president of Remco American's successor.

*Scheinert Bros., Inc.*—Agreed to accept 50 percent of $10,052.91 balance, payable during May 1971, with the

understanding that Gurbst would be president of Remco American's successor.

*Wellington Computer Graphics, Inc.*—Agreed to accept 50 percent of $19,306.22 balance, if paid by May 21, 1971. Also stated anticipating that future business with Remco American will justify the 50-percent loss.

*Hofmann Industries, Inc.*—Agreed to settle a balance of $45,462.08 for a total of $32,000, payable as follows: $22,731 by certified check on May 21, 1971; note for $6,819, due December 20, 1971; note for $2,450 due May 21, 1972.

*Pan Chemical Corp.*—Agreed to settle March 31, 1971, balance for 70 percent, payable in eight equal monthly installments, represented by a series of eight notes.[1] Settlement was agreed to in light of past good will and with hope to maintain future relationship.

At some time between April 15 and April 26, 1971, petitioner agreed to acquire all of the stock of Remco American from Remco Industries. A formal agreement was signed, effective April 30, 1971, and the transaction was closed on May 3, 1971. Shortly thereafter, the name of Remco American was changed to Roth American, Inc.[2]

As of April 30, 1971, a total of $327,500.10 was included in petitioner's accounts receivable as the balance due from American. On September 30, 1971, an entry was made in the books of petitioner transferring the amount of $327,500.10 out of accounts receivable and into a special account. On March 31, 1972, petitioner wrote off the sum of $172,443 (against the above-mentioned special account) as a bad debt. In its income tax return for the fiscal year ended April 30, 1972, petitioner claimed a deduction for an addition to its reserve for bad debts in the amount of $178,656. This was the amount determined by petitioner as necessary to bring its bad debt reserve to an appropriate yearend balance, after having charged against the reserve a total of $172,826 during the year (including the $172,443 written off in connection with American).

---

[1] The amount of the Mar. 31, 1971, balance, referred to in the settlement offer letter, is not clear from the record. The total indebtedness eventually forgiven was $33,000, but the total of the eight monthly payments was only $46,561.46.

[2] To avoid confusion, hereinafter Remco American and Roth American will be referred to simply as "American."

ULTIMATE FINDING OF FACT

Petitioner's addition to its reserve for bad debts for the taxable year ended April 30, 1972, was not a reasonable addition to such reserve, and respondent did not abuse his discretion in so determining.

OPINION

When Remco Industries filed a bankruptcy petition under chapter XI, and its subsidiary, American, teetered at the brink of a similar fate, petitioner found itself in a very difficult position as the principal creditor of American. Petitioner stood to lose not only one of its largest customers, but along with it the better part of $300,000 in uncollected receivables. It is certainly understandable that a creditor in such a situation would consider entering the toy business through a shotgun adoption of its errant debtor, an event which in fact took place very shortly after petitioner's president, Leonard Roth, first began toying with the idea.

The income tax question arising from such events is whether petitioner's acquisition of its debtor, American, in effect operated to change the nature of the debt and thereby preclude any bad debt deduction which may otherwise have been allowable to petitioner as an unrelated creditor. In disallowing petitioner's claimed bad debt deduction, respondent simply contends that there was no bad debt loss to petitioner within the framework of section 166[3] and the applicable regulations thereunder.

Section 166(a)(1) allows a deduction for a debt which becomes worthless within the taxable year, or alternatively under section 166(c) "(in the discretion of the Secretary or his delegate), a deduction for a reasonable addition to a reserve for bad debts." Because of the discretionary authority specifically granted in the allowance of deductions under the reserve method, respondent's determinations regarding the reasonableness of additions to bad debt reserves carry more than the usual presumptive correctness, and petitioner's burden of proof is greater than merely overcoming such presumption. *Roanoke Vending Exchange, Inc. v. Commis-*

---

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

*sioner,* 40 T.C. 735 (1963). Thus, petitioner must not only demonstrate that its addition to its reserve for bad debts was reasonable, but also that respondent's disallowance of such addition amounted to an abuse of discretion. *Krim-Ko Corp. v. Commissioner,* 16 T.C. 31 (1951). In our opinion the petitioner has failed to meet this heavy burden.

The deduction at issue here is for petitioner's addition to its bad debt reserve for its fiscal year ended April 30, 1972. Such addition, in the amount of $178,656, was equal to the net amount charged against the reserve during the year, $172,826 (including $172,443 relating to the American account), plus an additional $5,830 increasing the yearend reserve balance over the prior year's ending balance. Respondent's primary contention is that the addition to the reserve is not "reasonable" to the extent that it was necessitated by the previous charge of a portion of the American account against the then-established reserve balance.

Petitioner wrote off $172,443 of the American account on the rationale that such portion of the past due balance in April 1971 had become uncollectible due to a "composition with creditors" agreement, pursuant to which petitioner and several other major creditors had forgiven a large portion of American's past due balances in order to permit it to remain in business. We think there are several weaknesses in this rationale.

We begin with the observation that at no time here relevant was American involved in formal bankruptcy proceedings or even insolvent. Although it experienced financial difficulties, which came to a head in early 1971, it appears to have survived that crisis after its acquisition by petitioner, and has continued in business since that time as an active subsidiary of petitioner. Thus, there was no specific event in the corporate life of American establishing the worthlessness of any portion of its debt to petitioner with the degree of conclusiveness normally required for a bad debt deduction under section 166. *Estate of Pachella v. Commissioner,* 37 T. C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1962).

Petitioner has attempted to establish the partial worthlessness of its receivable from American by constructing a theory on brief that, prior to its acquisition of American, petitioner participated in a binding composition with creditors arrange-

ment, the legal effect of which was to formally extinguish a portion of the then-outstanding debt from American. However, the facts simply do not support this contention. According to the authorities cited by petitioner,[4] a composition with creditors involves a mutual agreement among two or more creditors of a common debtor to discharge a portion of their respective claims for less than the full amount. The agreement is legally binding because consideration for each such discharge is realized in the form of the promises of the other participants to effect a similar discharge.

Even accepting this definition of a composition with creditors, the events of April 1971, as indicated by the record herein, can hardly be said to have reached such a level of legal consequence. Petitioner, as American's largest creditor, initially agreed to accept a settlement for 32½ percent of its claim in an effort to get other creditors to do so as well. Other major creditors were contacted, and eventually several of them agreed in writing to accept less than 100 percent of their claims. Petitioner appears to maintain that the basic composition arrangement with creditors was for settlement of their claims at 50 percent. However, this percentage figure appears to have very little relationship to the 32½ percent originally agreed to by petitioner nor to the percentages reflected in the various settlement agreement letters from creditors introduced into evidence. Although some creditors agreed to accept 50 percent, others agreed only to higher percentages, and the overall impression to be gleaned from the record is that Gurbst simply dealt with each creditor individually and attempted to negotiate the lowest possible settlement figure that he could with each of them.

Petitioner relies heavily upon Gurbst's testimony that its agreement to settle its claim at a discount was an essential prerequisite to the willingness of the other creditors to accept a discount settlement. While these creditors may have expressed this position to Gurbst in the course of their settlement negotiations, the record contains no documentary evidence whatsoever that any of the settling creditors required any similar settlement by petitioner or any other creditor. Moreover, regardless of what may have been the

---

[4] Principally 15A Am. Jur. 2d Composition with Creditors sec. 5 (1976).

other creditors' initial feelings about the necessity for petitioner to take its licking along with the rest of them, once petitioner decided to acquire American as a subsidiary, the disposition of the intercompany account receivable/payable could thereafter have had no practical significance beyond a bookkeeping entry. Once American became in effect a part of petitioner, the ability of American to continue its business, as an important continuing customer of the settling creditors, was dependent upon the overall financial support to which petitioner was obviously committed after it acquired American, and not upon whether any portion of the liability to petitioner on the books of American would be extinguished without cash payment. In this context, American's debt to petitioner became essentially equivalent to a capital investment by petitioner.

Finally, and most significantly, Gurbst's testimony as to the attitude of the settling creditors is not supported by the several settlement commitment letters introduced into evidence. Of at least five such letters in evidence (settling liabilities aggregating in excess of $250,000) not one is in any way conditioned upon a concomitant agreement by any other creditor. Such is not the stuff of which compositions with creditors are made. For a composition arrangement to be binding, it must appear that the creditors so stipulated not only with the debtor but also with the other creditors. 15A Am. Jur. 2d Composition with Creditors sec. 3 (1976). *Windhorst v. Brandt,* 18 Ohio App. 59 (1923). The evidence in this case fails to establish that petitioner had a binding legal commitment to the debtor or to the other creditors (as part of a formal composition arrangement) to cancel any portion of its claim against American. This being the case, any such cancellation by petitioner would be essentially a voluntary action which, regardless of the business motivation therefor, would not be sufficient basis for a bad debt deduction under section 166. *American Felt Co. v. Burnet,* 58 F.2d 530 (D.C. Cir. 1932). Compare *Oleet v. Commissioner,* 8 B.T.A. 826 (1927), in which a deductible bad debt was established as a result of a court-confirmed composition with creditors.

Petitioner's case suffers from a further fatal flaw: Petitioner contends that the composition with creditors was agreed to in April 1971. Petitioner's taxable year ended April 30, 1971;

however, the "bad debt" was not written off until just prior to the close of the following taxable year, ended April 30, 1972.[5] This belated timing of the writeoff seems entirely inconsistent with the very rationale underlying the purported loss, which rationale requires a finding that petitioner became legally bound to a composition with creditors prior to April 30, 1971 (the date it acquired American). We detect a scent of posttransaction tax planning. Petitioner attempts to bridge this temporal and theoretical gap with a balsa plank, contending that although the alleged composition with creditors was agreed to in fiscal 1971, the actual cancellation of the indebtedness and loss arising pursuant thereto did not take place until fiscal 1972. We can discern no viable legal rationale for such a position. To the contrary, the plain language of section 166 refers to debts which become worthless "within the taxable year." If indeed there had been a legally binding composition with creditors in April 1971, as petitioner contends, it would have been that event, and not petitioner's subsequent bookkeeping entries, which would have established the bad debt within the framework of section 166.[6] See *Brown v. Commissioner*, 10 B.T.A. 1036, 1055 (1928).

Accordingly, we hold that petitioner has failed to establish that any portion of its account receivable from American became worthless within its taxable year ended April 30, 1972.

Petitioner's total deduction for addition to its reserve for bad debts was $178,656. This encompassed the $172,443 which had been charged against the reserve in connection with the American account, plus an additional $6,213, which respondent has also disallowed. As to this additional amount, petitioner, who bears the heavy burden of establishing that the disallowance was an abuse of discretion, has introduced virtually no evidence. On brief petitioner has attempted to justify this increment to its reserve on the basis of past bad

---

[5] Under petitioner's theory, its cancellation of indebtedness from American might have given rise to a corresponding amount of income to American, which was then a subsidiary of petitioner. If so, such income would be of no consequence, due to American's substantial net operating loss carryforwards.

[6] The time for fixing worthlessness for purposes of a charge against a bad debt reserve is governed by the same rules as the deduction of debts under the specific chargeoff method. *Paramount Liquor Co. v. Commissioner*, 242 F.2d 249 (8th Cir. 1957), affg. a Memorandum Opinion of this Court.

debt experience, an aging of its accounts receivable, and "other external and internal economic conditions affecting its business." However, its position is not sustainable for several reasons.

First, the past bad debt experience to which petitioner refers in computing the appropriate reserve balance consists principally of the $172,443 written off in connection with the American account, and we have found that such amount was not an allowable bad debt. Without this item petitioner's bad debt experience totaled only $45,553 in the entire 6-year period ended April 30, 1972, an average of less than $7,600 per year. Yet petitioner's claimed addition to its reserve for fiscal 1972 would leave a yearend reserve balance of $40,590. Petitioner, in its brief, explains this with the following assertion: "Such additional percentage was added after considering an aging of its accounts receivable in light of its past collection experiences and after it considered other external and internal economic conditions affecting its business." Unfortunately, however, petitioner made no effort to substantiate its reserve computation through testimony or documentary evidence supporting these general assertions. See *Atlantic Bank & Trust Co. v. Commissioner,* 10 B.T.A. 796 (1928). In fact, to the contrary, the internal revenue agent who examined petitioner's return testified on cross-examination that he had attempted to obtain from petitioner and its accountant appropriate substantiation but was given none. In these circumstances we can find no basis for overturning the disallowance of the petitioner's addition to its bad debt reserve. *Imperial Type Metal Co. v. Commissioner,* 106 F.2d 302 (3rd Cir. 1939), affg. a Memorandum Opinion of this Court.

*Decision will be entered for the respondent.*