TIME ACCEPTANCE, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Time Acceptance, Inc. v. Commissioner
Docket Nos. 21190-82, 21191-82, 21192-82, 21193-82, 21194-82, 21195-82, 21196-82.
United States Tax Court
T.C. Memo 1985-173; 1985 Tax Ct. Memo LEXIS 455; 49 T.C.M. (CCH) 1186; T.C.M. (RIA) 85173; April 8, 1985. *455 Ps were consumer finance corporations. The Commissioner redetermined Ps' allowable additions to their reserves for bad debts by use of the Black Motor formula. Held, Ps failed to prove that the Commissioner's determination of the allowable additions to their reserves was unreasonable. Robert R. Casey, for the petitioners. Linda K. West, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal *456 income taxes: Taxable Year
Docket No.
Petitioner
Ended June 30
Deficiency
21190-82
Time Acceptance, Inc.
1977
$5,382.00
1978
3,540.00
21191-82
Community Acceptance
1977
1,467.00
Corporation of
1978
2,327.00
Donaldsonville
21192-82
Time Acceptance of
1978
4,482.00
Zachary, Inc.
21193-82
Gonzales Acceptance
1977
1,961.00
Corporation
1978
3,228.00
1979
3,528.05
21194-82
Community Acceptance
1977
14,613,00
Corporation
1978
16,891.00
1979
7,568.00
21195-82
Community Acceptance
1977
723.00
Corporation of
1978
4,622.00
Baton Rouge
21196-82
Delta Acceptance
1977
2,142.00
Corporation
1978
4,409.00
Delta Acceptance Corporation has conceded its case. After such concession, the issue for decision is whether the Commissioner abused his discretion in redetermining the allowable additions to the petitioners' bad debt reserves. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Each of the petitioners is a Louisiana corporation, and each had its principal place of business in Louisiana when its petition in this case was filed. All of the petitioners *457 filed their Federal corporate income tax returns for the years at issue with the Internal Revenue Service Center, Austin, Tex., except that the returns of Gonzales Acceptance Corporation and Community Acceptance Corporation for the taxable year ended June 30, 1979, were, so far as we know, merely filed somewhere with the Internal Revenue Service. We will refer to a taxable year of a petitioner by the calendar year in which such year ended. Time Acceptance, Inc. (Time Acceptance), was incorporated on September 14, 1970. Community Acceptance Corporation of Donaldsonville (Community of Donaldsonville) was incorporated on March 1, 1965. Time Acceptance of Zachary, Inc. (Time of Zachary), was incorporated on September 14, 1972. Gonzales Acceptance Corporation (Gonzales) was incorporated on February 6, 1973. Community Acceptance Corporation (Community Acceptance) was incorporated on August 18, 1964. Community Acceptance Corporation of Baton Rouge (Community of Baton Rouge) was incorporated on May 16, 1968. All of the petitioners are in the consumer finance business, and Leo P. Lambert, Jr., was an officer in each of them. The petitioners make loans to individuals either on an *458 unsecured basis or secured by chattel mortgages on household goods, furniture, television sets, and appliances. Generally, their customers are blue-collar workers and are individuals who cannot borrow money from lending institutions, such as banks. Some of the loans made by the petitioners are for up to 5 years. The petitioners finance their operations by borrowing from commercial lenders such as General Electric Credit Corporation. Such indebtedness is secured by pleadges of the petitioners' consumer promissory notes and chattel mortgages. Each petitioner's reserve for bad debts was established in connection with the annual audit of each petitioner. The reserves for bad debts were established in accordance with the following procedures: The petitioners' independent certified public accountant visited each branch office of each eptitioner in connection with the annual audit. He examined all individual delinquent loan cards and samples of all other loan cards representing loans to customers. He selected various accounts and reviewed their loan files. He mailed confirmation slips to a sample group of customers, including delinquent customers. He also reviewed all delinquency *459 summaries prepared by each office showing the accounts for which no payments had been received within the previous 3-, 60-, and 90-day periods. In order to determine which delinquent accounts were likely to become worthless, the accountant reviewed all actions taken by the branch managers to determine whether all efforts had been made to collect the delinquent accounts. He then reviewed the monthly reports of the commercial lenders from whom the petitioners borrow funds. The petitioners' lenders recompute their lending base on a monthly basis by independently examining the petitioners' finance notes receivable. After reviewing the delinquency summaries prepared by each branch manager, the collateral for each delinquent loan, and the history of all payments on each delinquent loan, the petitioners' accountant discussed the delinquent accounts with each petitioner's management and with the individual loan office managers and obtained their recommendations as to which accounts should be written off against the reserve for bad debts. Based on such review and discussions, the accountant prepared his workpapers which listed the delinquent accounts for each petitioner and his estimate *460 of what the reserve should be as of the end of each year in order to take into account that portion of the delinquent accounts which he reasonably believed would become wortheless in the future. The petitioners' accountant made recommendations concerning the appropriate bad debt reserves to the petitioners' management. The bad debt reserves were the product of discussions between the petitioners' management and their accountant. The final decision concerning at what levels to set the bad debt reserves was made by the management. The management of the petitioners generally was reluctant to chargeoff notes receivable as recommended by the accountant. One reason given for such reluctance was that loans which were charged off reduce the base upon which the petitioners' commercial lenders determine how much they were willing to loan the petitioners. Another reason for such reluctance was that if a loan was kept on the books, it was more likely that collection efforts by the petitioners' employees would continue with respect to that loan. When an account became delinquent for a period of 2 days, a first notice was mailed to the borrower. Thereafter, subsequent notices were mailed *461 every 2 days, and prior to the third notice, the borrower was contacted by telephone. After such notices were sent, a borrower was contacted by telephone several times a week, and occasionally, several times a day. Sometimes a borrower was visited at home or asked to come into one of the petitioners' offices to discuss an overdue account. Occasionally, a customer's loan was renewed. Usually, the customer wanted to borrow more money, or he needed to have the payment schedule adjusted so that the payments were smaller. Renewals of notes receivable were treated as new loans on the petitioners' books in the year of renewal. Effective January 1, 1973, Louisiana banks were permitted to make loans to individuals at rates of interest comparable to the rates charged by the petitioners. This change caused many of the petitioners' better customers to borrow money from banks rather than from the petitioners, and accordingly, the petitioners were forced to make more loans involving higher risks. The revenue agent assigned to audit the petitioners first did a pre-audit analysis. He then conducted an initial interview with Mr. Lambert. After the initial interview, the agent examined the *462 books and records of the petitioners, reconciling the figures in the books and records with the figures on the tax returns. In some cases, he adjusted the tax year in which certain debts were charged off. Finally, he determined that the petitioners' additions to bad debt reserves were unreasonable, by use of the Black Motor formula. The agent who conducted the audit of the petitioners did not inquire as to what portion of the notes receivable outstanding at the end of each year represented renewals of loans originally made in prior years. He did review renewal loans which were part of the chargeoffs on the petitioners' returns. He did not review notes receivable outstanding as of the end of each year on which an installment payment had not been made within the prior 30-, 60-, or 90-day period and which had not as yet been charged off by the petitioners against their reserves as of the close of each year. He also did not review or determine what collection efforts had been made with respect to outstanding loans on which no installment payment had been received within the prior 30-, 60-, or 90-day period as of the end of each year. Nor did he review the collection efforts *463 made by the petitioners with respect to delinquent accounts that were not charged off as of the end of each year. The agent did not review the amount of notes receivable of each petitioner outstanding as of the end of each fiscal year which subsequently were charged off against the reserve of each petitioner as of the date of the audit. The only adjustments made as a result of the audit were reductions in the additions to the petitioners' bad debt reserves. For each petitioner, the amount listed on its corporate income tax returns as trade notes and accounts receivable outstanding at the end of the year, the amount added to reserve, the amount charged against reserve, and the reserve for bad debts at the end of the year were as follows: Trade notes
and accounts
Amount added
Amount charged
Reserve for
Year
receivable
to reserve
against reserve
bad debts
TIME ACCEPTANCE
1978
$1,295,110
$13,586
$19,995
$64,755
1977
1,423,281
34,945
21,674
71,164
1976
1,447,325
19,400
17,320
57,893
1975
1,395,316
37,170
21,015
55,813
1974
1,321,931
20,896
4,420
39,658
1973
772,720
15,145
11,709
23,182
1972
658,211
16,886
8,352
19,746
COMMUNITY OF DONALDSONVILLE
1978
$ 829,950
$11,638
$ 5,480
$33,198
1977
676,000
12,848
6,699
27,040
1976
522,285
5,331
5,153
20,891
1975
517,836
12,408
4,640
20,713
1974
431,491
4,241
3,636
12,945
1973
415,777
5,692
4,744
12,340
1972
379,728
7,116
6,699
11,392
TIME OF ZACHARY
1978
$522,540
$ 9,479
$11,980
$20,902
1977
585,087
6,497
1,136
23,403
1976
451,040
5,628
6,986
18,042
1975
485,004
10,383
6,554
19,400
1974
519,021
10,059
8,353
15,571
1973
462,163
13,865
13,865
GONZALES
1979
$914,835
$22,876
$20,074
$35,948
1978
828,659
14,482
10,989
33,146
1977
743,657
10,014
4,095
29,653
1976
593,353
6,654
4,194
23,734
1975
531,843
13,090
2,870
21,274
1974
368,451
7,627
11,054
1973
114,205
3,427
3,427
COMMUNITY ACCEPTANCE
1979
$1,642,831
$61,830
$56,212
$82,142
1978
1,530,481
37,656
16,180
76,524
1977
2,028,815
35,507
16,900
81,153
1976
1,563,649
21,486
8,473
62,546
1975
1,228,333
31,239
8,044
49,533
1974
877,926
8,229
8,535
26,338
1973
888,137
14,816
14,814
26,644
1972
888,053
21,580
24,272
26,642
COMMUNITY OF BATON ROUGE
1978
$1,669,635
$31,528
$20,539
$66,785
1977
1,394,902
23,720
924
55,796
1976
825,012
12,948
14,165
33,000
1975
855,422
24,594
10,481
34,217
1974
670,131
18,927
18,245
20,104
1973
647,258
15,520
15,993
19,422
1972
663,170
17,662
17,048
19,895
*464 For each petitioner, the ratio of amount charged against reserve to trade notes and accounts receivable outstanding at the end of the year and the ratio of reserve for bad debts at the end of the year to trade notes and accounts receivable were as follows: Ratio of amount charged
Ratio of reserve for bad
against reserve to trade
debts at end of year to
notes and accounts
trade notes and accounts
Year
receivable
receivable
TIME ACCEPTANCE
1978
1.54
5.00
1977
1.52
5.00
1976
1.20
4.00
1975
1.51
4.00
1974
.33
3.00
1973
1.52
3.00
1972
1.27
3.00
COMMUNITY OF DONALDSONVILLE
1978
.66
4.00
1977
.99
4.00
1976
.99
4.00
1975
.90
4.00
1974
.84
3.00
1973
1.14
2.97
1972
1.76
3.00
TIME OF ZACHARY
1978
2.29
4.00
1977
.19
4.00
1976
1.55
4.00
1975
1.35
4.00
1974
1.61
3.00
1973
3.00
GONZALES
1979
2.19
3.93
1978
1.33
4.00
1977
.55
3.99
1976
.71
4.00
1975
.54
4.00
1974
3.00
1973
3.00
COMMUNITY ACCEPTANCE
1979
3.42
5.00
1978
1.06
5.00
1977
.83
4.00
1976
.54
4.00
1975
.65
4.03
1974
.97
3.00
1973
1.67
3.00
1972
2.73
3.00
COMMUNITY OF BATON ROUGE
1978
1.23
4.00
1977
.07
4.00
1976
1.72
4.00
1975
1.23
4.00
1974
2.72
3.00
1973
2.47
3.00
1972
2.57
3.00
*465 The following chart contains, for each petitioner, the amounts listed on its accountant's workpapers [2] as total loans (after chargeoff), reserve for bad debts (after chargeoff), chargeoffs, delinquent accounts (after chargeoff), and accounts outstanding at year end which have been subsequently charged off. It also includes out calculations of the ratio of reserve for bad debts (after chargeoff) to the amount of all delinquent accounts (after chargeoff) and the ratio of reserve for bad debts (after chargeoff) to accounts over 90 days delinquent (after chargeoff): TIME ACCEPTANCE 1976
1977
1978
1979
1980
Total loans
$1,034,552
$1,423,281
$1,295,110
$1,373,460
$1,416,284
Reserve for
bad debts
41,382
56,931
64,753
68,673
70,814
Chargeoffs
30 days
0  0  0  0  0  60 days
894
0  0  0  0  90 days
9,149
18,180
26,032
24,037
25,193
Total
$ 10,043
$ 18,180
$ 26,032
$ 24,037
$ 25,193
Delinquent
accounts
30 days
41,124
79,163
80,943
24,703
60,567
60 days
25,709
20,788
18,202
21,116
22,545
90 days
25,391
83,632
78,521
48,526
58,543
Total
$ 92,224
$ 183,583
$ 177,666
$ 94,345
$ 141,655
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
70,777
74,998
27,955
Ratio of re-
serve for bad
debts to all
delinquent
accounts
44.87
31.01
36.45
72.79
49.99
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
162.98
68.07
82.47
141.52
120.96
*466 COMMUNITY OF DONALDSONVILLE 1976
1977
1978
1979
1980
Total loans
$522,285
$676,000
$829,950
$759,444
$632,252
Reserve for
bad debts
20,891
27,040
33,198
30,378
25,290
Chargeoffs
30 days
0  0  0  0  0  60 days
0  0  0  0  0  90 days
6,857
8,913
7,291
8,335
11,086
Total
$ 6,857
$ 8,913
$ 7,291
$ 8,335
$ 11,086
Delinquent
accounts
30 days
12,773
22,201
43,154
35,525
27,288
60 days
5,884
9,276
15,480
21,435
18,419
90 days
8,038
9,287
33,969
39,342
34,962
Total
$ 26,695
$ 40,764
$ 92,603
$ 96,302
$ 80,669
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
26,642
70,540
17,448
Ratio of re-
serve for bad
debts to all
delinquent
accounts
78.26
66.33
35.85
31.54
31.35
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
259.90
291.16
97.73
77.22
72.34
TIME OF ZACHARY 1976
1977
1978
1979
1980
Total loans
$451,041
$585,087
$522,540
$914,835
$889,999
Reserve for
bad debts
18,042
23,403
20,902
36,593
35,600
Chargeoffs
30 days
0  0  0  0  0  60 days
0  0  0  0  0  90 days
9,487
11,821
16,149
10,496
13,451
Total
$ 9,487
$ 11,821
$ 16,149
$ 10,496
$ 13,451
Delinquent
accounts
30 days
36,744
52,397
27,102
61,357
73,934
60 days
10,514
18,515
10,109
5,342
7,647
90 days
25,108
41,436
44,071
24,957
17,241
Total
$ 72,366
$112,348
$ 81,282
$ 91,656
$ 98,822
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
43,606
68,581
44,888
Ratio of re-
serve for bad
debts to all
delinquent
accounts
24.93
20.83
25.72
39.92
36.02
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
71.86
56.48
47.43
146.62
206.48
*467 GONZALES 1976
1977
1978
1979
Total loans
$593,353
$743,658
$828,659
$914,835
Reserve for
bad debts
23,734
29,653
33,146
36,593
Chargeoffs
30 days
0  0  0  0  60 days
0  0  0  0  90 days
5,565
5,434
14,580
10,496
Total
$ 5,565
$ 5,434
$ 14,580
$ 10,496
Delinquent
accounts
30 days
23,981
25,703
36,131
61,357
60 days
8,252
11,943
8,409
5,342
90 days
15,497
23,245
20,646
24,957
Total
$ 47,730
$ 60,891
$ 65,186
$ 91,656
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
30,201
28,246
10,125
Ratio of re-
serve for bad
debts to all
delinquent
accounts
49.73
48.70
50.85
39.92
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
153.15
127.57
160.54
146.62
COMMUNITY ACCEPTANCE
1976
1977
1978
1979
1980
Total loans
$1,152,073
1,434,950
1,530,481
$1,680,400
$1,751,201
Reserve for
bad debts
46,082
57,398
76,524
84,020
87,560
Chargeoffs
30 days
0  0  0  0  0  60 days
0  0  0  0  3,249
90 days
10,080
15,230
18,953
35,534
23,693
Total
$ 10,080
$ 15,230
$ 18,953
$ 35,534
$ 26,942
Delinquent
accounts
30 days
60,199
69,747
67,047
59,846
127,454
60 days
16,266
20,359
18,421
16,295
21,278
90 days
33,836
28,004
63,423
69,594
76,240
Total
$ 110,301
$ 118,110
$ 148,891
$ 145,735
$ 224,972
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
99,709
106,073
$65,855
Ratio of re-
serve for bad
debts to all
delinquent
accounts
41.78
48.60
51.40
57.65
38.92
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
136.19
204.96
120.66
120.73
114.85
*468 COMMUNITY OF BATON ROUGE 1976
1977
1978
1979
1980
Total loans
$825,012
$1,394,902
$1,669,635
$1,596,829
$1,300,549
Reserve for
bad debts
33,000
$55,796
66,785
63,873
104,044
Chargeoffs
30 days
0  789
2,184
0  0  60 days
0  0  0  0  0  90 days
18,848
28,800
24,454
38,185
36,038
Total
$ 18,848
$ 29,589
$ 26,638
$ 38,185
$ 36,038
Delinquent
accounts
30 days
12,412
117,705
96,873
68,240
145,805
60 days
14,308
57,029
30,259
39,232
43,839
90 days
47,900
34,185
63,876
56,122
149,626
Total
$ 74,620
$ 208,919
$ 191,008
$ 163,594
$ 339,270
Accounts out-
standing at
year end which
have been
charged off as
of 6/30/83
97,779
132,751
165,596
Ratio of re-
serve for bad
debts to all
delinquent
accounts
44.22
26.71
34.96
39.04
30.67
Ratio of re-
serve for bad
debts to accounts
delinquent more
than 90 days
68.89
163.22
104.55
113.81
69.54
*469 In his notices of deficiency, the Commissioner determined that the petitioners' additions to their reserves for bad debts were not reasonable. The amounts claimed by the petitioners and the amounts allowed by the Commissioner were as follows: Addition to
Addition to
reserve claimed
reserve allowed
Time Acceptance
1977
$34,945
$0  1978
13,586
4,254
Community of Donaldsonville
1977
12,848
0  1978
11,638
0  Time of Zachary
1978
9,479
0  Gonzales
1977
10,014
0  1978
14,482
0  1979
22,876
10,081
Community Acceptance
1977
35,507
0  1978
37,656
0  1979
61,830
0  Community of Baton Rouge
1977
23,720
0  1978
31,528
10,346
OPINION We must decide whether the Commissioner's determination of the allowable additions to the petitioners' reserves for bad debts was unreasonable. In lieu of the deduction provided by section 166(a) of the Internal Revenue Code of 1954[3] for specific debts that become wholly or partially worthless within the taxable year, section 166(c) allows *470 "(in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts." (Emphasis added.) Under the reserve method for handling bad debts, the reserve is reduced by charging against it specific debts which become worthless during the taxable year and is increased by crediting it with additions which are reasonable within the meaning of section 166(c). James A. Messer Co. v. Commissioner,57 T.C. 848, 864 (1972); Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735, 740 (1963). A bad debt reserve serves as an estimate of the losses that can reasonably be expected to result from the debts outstanding at the close of the taxable year. Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1067 (1980); J.E. Hawes Corp. v. Commissioner,44 T.C. 705, 707 (1965); Handelman v. Commissioner,36 T.C. 560, 565 (1961). If at the close of a taxable year the reserve appears inadequate to cover the portion of the taxpayer's accounts receivable which reasonably can be expected to prove worthless, the amount in the reserve ought to be increased. Westchester Development Co. v. Commissioner,63 T.C. 198, 210-211 (1974); *471 Roanoke Vending Exchange, Inc. v. Commissioner,supra.
In connection with the determination of the proper amount of a reserve for bad debts, section 1.166-4(b)(1), Income Tax Regs., provides: (b) Reasonableness of addition to reserve--(1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. This Court has stated that the past experience of the taxpayer in collecting accounts and notes receivable is a reliable guide for measuring *472 probable future losses. Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. at 741; Home Ice Cream & Ice Co. v. Commissioner,19 B.T.A. 762, 765 (1930). The estimated amount of the reserve required for any year must be measured by the conditions as they appear at the time the estimate is made, and accordingly, reliance may not be placed upon subsequent events to justify enlarging the estimate of an already reasonable reserve. However, although a taxpayer may not retroactively adjust annual additions to the reserve because unanticipated future losses disclose them to have been inadequate, the subsequent loss experience of a taxpayer may, nevertheless, properly be considered as additional evidence tending either to demonstrate the reasonableness or unreasonableness of its method of computing annual additions to its bad debt reserve. Roanoke Vending Exchange, Inc. v. Commissioner,supra;Apex Brewing Co. v. Commissioner,40 B.T.A. 1110, 1120 (1939). Thus, evidence of the uncollectibility of certain accounts subsequent *473 to the taxable years has a limited role in our decision. Roanoke Vending Exchange, Inc. v. Commissioner,supra;Carithers-Wallace-Courtenay v. Commissioner,5 T.C. 942, 945-946 (1945). The Commissioner's determination with respect to additions to a reserve for bad debts carries a great deal of weight because of the discretion vested in him under section 166(c); accordingly, the burden of proof on a taxpayer is greater than the usual burden which faces the taxpayer who seeks to disprove the Commissioner's determination. Roth Steel Tube Co. v. Commissioner,68 T.C. 213, 218-219 (1977), affd. 620 F.2d 1176, 1179 (6th Cir. 1980); Roanoke Vending Exchange, Inc. v. Commissioner,supra;Krim-Ko Corp. v. Commissioner,16 T.C. 31, 37 (1951). The petitioner must show that the Commissioner's action in disallowing its additions to the reserve was arbitrary and amounted to an abuse of discretion. Westchester Development Co. v. Commissioner,63 T.C. at 211; Roanoke Vending Exchange, Inc. v. Commissioner,supra; *474 Krim-Ko Corp. v. Commissioner,supra.If the petitioner succeeds in carrying that heavy burden, it must also show that its additions to the reserve were reasonable. Westchester Development Co. v. Commissioner,supra;Roanoke Vending Exchange, Inc. v. Commissioner,supra.
In the present case, the Commissioner used the Black Motor formula to recompute the petitioners' additions to their bad debt reserves. The Black Motor formula originated in Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. on other grounds 125 F.2d 977 (6th Cir. 1942), where the reasonableness of an addition to the taxpayer's bad debt reserve was measured by the taxpayer's actual bad debt experience during the current year and the 5 immediately preceding years. Pursuant to the formula, a computation is made to determine the average percentage of debts actually charged off during each of the 6 years in relation to the relevant outstanding year-end receivables in order to determine what percentage of the outstanding year-end debts of the current year can reasonably be expected to become worthless *475 thereafter. The Supreme Court upheld the use of the Black Motor formula in Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979). The Court declared: Common sense suggests that a firm's recent credit experience offers a reasonable index of the credit problems it may suffer currently. And the formula possesses the not inconsiderable advantage of enhancing certainty and predictability in an area peculiarly susceptible of taxpayer abuse. In any event, after its 40 years of nearuniversal acceptance, we are not inclined to disturb the Black Motor formula now. [439 U.S. at 549.] The Court also pointed out: Since it first received the approval of the Tax Court in 1940, the Black Motor bad-debt formula has enjoyed the favor of all three branches of the Federal Government. The formula has been employed consistently by the Commissioner, approved by the courts, and collaterally recognized by the Congress. * * * [439 U.S. at 548; fn. refs. omitted.] However, the Court also recognized that there are situations in which the formula might generate an arbitrary result: If a taxpayer's most recent bad-debt experience *476 is unrepresentative for some reason, a formula using that experience as data cannot be expected to produce a "reasonable" addition for the current year. * * * [439 U.S. at 549; fn. ref. omitted.] The petitioners in the present case have failed to meet their greater than usual burden of proof; on the record before us, they have not established that the Commissioner's determination was unreasonable. The petitioners make a number of arguments; we will discuss their arguments in turn. First, the petitioners argue that although the Black Motor formula may properly be applicable to reserves for bad debts in a business involving trade receivables, which are generally collected within 90 days, it is not an appropriate method to calculate bad debt reserves for consumer finance companies. They attempt to support this contention by stating that consumer finance companies usually make loans having maturities of 5 or more years and, thus, that such loans may not be charged off for up to 5 years or more after the loans are made. There is evidence in the record, and we have found as a fact, that some of the petitioners' loans had maturities in excess of 5 years. However, *477 there is no evidence in the record concerning what portion of the petitioners' loans had maturities of 5 or more years. The petitioners have failed to introduce sufficient evidence to support their argument, and consequently, we are not persuaded by such argument. The petitioners likewise have failed to introduce sufficient evidence to support another of their arguments. They argue that they wait a much longer time before charging off notes receivable against their reserves for bad debts than do other consumer finance companies generally. However, their evidence on this point consisted of one of their employees testifying only that three local companies, that he had previously worked for, charged off notes receivable sooner than the petitioners. Such evidence hardly establishes what is generally the practice of consumer finance companies. Furthermore, the Supreme Court in Thor Power Tool Co. v. Commissioner,supra, essentially rejected the argument which the petitioners herein attempt to make: Thor faults the Black Motor formula because of its retrospectivity: By ascertaining current additions to a reserve by reference to past chargeoff experience, *478 the formula assertedly penalizes taxpayers who have delayed in making writeoffs in the past, or whose receivables have just recently begun to deteriorate. Petitioner's objection is not altogether irrational, but it falls short of rendering the formula arbitrary. * * * [439 U.S. at 548-549.] The present case warrants a similar conclusion. The petitioners also contend, citing Industrial Credit Co. v. Commissioner,T.C. Memo 1967-75, that the jurisprudence to date supports the use by finance companies of methods other than the Black Motor formula to determine the proper levels of bad debt reserves. This argument is seriously flawed. The Black Motor formula has been used to establish appropriate bad debt reserves for consumer finance companies. See Atlantic Discount Co. v. United States,473 F.2d 412 (5th Cir. 1973); S.W. Coe & Co. v. Dallman,216 F.2d 566 (7th Cir. 1954). In addition, the case relied on by the petitioners is readily distinguishable since the taxpayer therein was an industrial finance company which financed industrial machinery, particularly road building equipment. In Industrial *479 Credit Co., we explicitly based our holding that the taxpayer's reserves for bad debts were reasonable on our findings of fact that the taxpayer was engaged in a high risk financing business, that it had not had sufficient time in which to develop a history of actual bad debts, and that comparable lending institutions which had less risk were allowed a larger percentage of bad debts. The record in the present case does not support comparable fact findings. The petitioners do argue that they had not been engaged in business for a sufficient length of time prior to the years at issue to establish a representative history of bad debt chargeoffs. However, four of the petitioners had been in existence for more than 5 years before the years at issue: two for more than 11 years, one for more than 8 years, and the other nearly 6 years. Only two of the petitioners, Time of Zachary and Gonzales, had not been in business for more than 5 years before the years at issue. Time of Zachary had been in business for more than 4-1/2 years prior to the beginning of its 1978 taxable year, and Gonzales had been in business for more than 3 years prior to the beginning of its 1977 taxable year. The *480 petitioners have not confined this argument to these two companies; rather, the petitioners argue that even the three companies that had been in business for more than 8 years had not developed a sufficient loss experience to permit application of the Black Motor formula. The Black Motor formula measures the reasonableness of an addition to a bad debt reserve by using the taxpayer's actual bad debt experience during the current year and the 5 immediately preceding years. Absent some showing that a reserve calculated thereby is inadequate, we must sustain the application of such formula. Thor Power Tool Co. v. Commissioner,supra at 550-551. The petitioners also point to the amounts of delinquent loans as evidence that their additions to their bad debt reserves were reasonable. They argue that their ratios of reserves to total delinquent accounts ranged from 26.7 percent to 68.7 percent [4] and that such ratios are lower than the 78 percent approved in Norfolk Industrial Loan Association v. United States, an unreported case ( E.D. Va. 1970, 70-2 U.S.T.C. par. 9527, 26 A.F.T.R.2d 70-5296). [5] In the present case, the petitioners' reliance *481 on the ratios of reserves to total delinquent accounts is misplaced. According to the workpapers of the petitioners' accountant, during the years 1976 through 1980, for all six petitioners, there were only 4 years in which loans delinquent for less than 90 days were charged off: In 1976, Time Acceptance charged off $894, which was 60 days delinquent; in 1980, Community Acceptance charged off $3,249, which was 60 days delinquent; and in 1977, Community of Baton Rouge charged off $789, which was 30 days delinquent, and in 1978, it charged off $2,184, which was 30 days delinquent. Thus, it was comparatively rare for any of the petitioners to chargeoff loans less than 90 days delinquent. When the petitioners' reserves for bad debts, as set forth in the accountant's workpapers, are compared to the accounts over 90 days delinquent, the ratios are significantly higher during the years at issue, ranging from 47.43 percent to 291.16 percent. For from demonstrating the reasonableness of the petitioners' additions to their bad debt reserves, such ratios show the unreasonableness of those reserves. *482 Crucial to this case is the method by which the petitioners' additions to their bad debt reserves were calculated. The petitioners argue that computations of additions to bad debt reserves may be made based upon a review by a taxpayers' certified public accountant of delinquent loans and a determination of what portion of those loans is likely to become worthless in the future. In Westchester Development Co. v. Commissioner,supra, the taxpayer had been in existence for only a brief time, and its borrowers constituted particularly poor risks. Under the circumstances, we concluded that it was reasonable for the taxpayer to compute its additions to its reserves for bad debts by relying on the advice of its independent accountant. The accountants had investigated individual debtors of the taxpayer to determine a reasonable addition to the taxpayer's bad debt reserve. In the present case, the petitioners argue that the method they employed was substantially identical to that used in Westchester Development. However, the facts simply do not support the petitioners' contention. Although we found as a fact that the petitioners' accountant examined each individual *483 delinquent loan card, as well as other loan cards, that he reviewed certain loan files, delinquency summaries, collection efforts, and commercial lenders' monthly reports, and that he consulted with the petitioners' management and individual loan office managers, we did not find as a fact that the accountant's recommendations were accepted by the petitioners in setting the amounts of their bad debt reserves.Rather, we found that the reserves were the product of discussions between the petitioners' management and the accountant, but that the ultimate decision was made by the petitioners' management. These circumstances, among others, distinguish the present case from Westchester Development, since in that case the taxpayer had only a brief operational history and since the taxpayer's addition to its bad debt reserve was very close to the amount recommended by its disinterested accountants. Moreover, we have calculated the ratio of reserves for bad debts to total loans outstanding for each of the petitioners during the years 1973 through 1978 or 1979 and for some of the petitioners for the years 1972 through 1978 or 1979. We rounded our calculations to the nearest one-hundredth *484 of a percent. In 38 of the total of 42 years for which ratios were calculated, the ratios were exact percentages, to the hundredth of a percent. In the 4 years where the ratios were not exact percentages, the ratios were within seven one-hundredths of an exact percentage. We cannot ignore the obvious. The fact that the petitioners' bad debt reserves were, for the most part, exact percentages of their total loans outstanding is surely not a mere coincidence. Such relationship strongly suggests that the petitioners' reserves were merely determined as a percentage of the outstanding debts, and that such reserves were not based on a careful analysis of the worthlessness of such outstanding debt. Finally, the petitioners argue that the reasonableness of their bad debt reserves is evidenced by the fact that each petitioner through 1983 has charged off an amount of loans outstanding as of the close of the years at issue which approximated or far exceeded the balances in its bad debt reserves as of the close of the years at issue. The petitioners contend that the reason that the chargeoffs through 1983 have not in every case equalled or exceeded the amount of the bad debt reserves *485 as of 1979 is that the period from 1979 through 1983 was an insufficient amount of time for the chargeoffs to occur. However, what constitutes a reasonable addition to a reserve for bad debts must be determined in light of the facts existing at the close of the taxable year of the addition. See. 1.166-4(b), Income Tax Regs. Evidence of the uncollectibility of certain accounts subsequent to the taxable year has a limited role in our determination. Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. at 741; Carithers-Wallace-Courtenay v. Commissioner,5 T.C. at 945.Other than their subsequent loss experience, the petitioners have not presented evidence that their additions to their bad debt reserves during the years at issue were reasonable. Consequently, we find that they have failed to prove that such additions were necessary. In summary, the Commissioner has calculated the amounts needed for the petitioners' reserves for bad debts by use of the Black Motor formula. His determination must be given great weight and must be sustained unless *486 arbitrary. Thor Power Tool Co. v. Commissioner,supra at 547-548. The Black Motor formula has the advantages that it bases the reserves on past experience and results in predictability. For such reasons, it is generally used, and we will sustain the Commissioner's reliance on it in the absence of a showing that a taxpayer's past history is not representative. The petitioners have made several attempts to demonstrate that their past history was not representative, but those attempts, singularly or in the aggregate, were simply not sufficient to overcome the weight to be given to the Commissioner's determination and the Black Motor formula. After carefully reviewing all of the petitioners' arguments, we are not convinced that their past history is not representative or that it does not provide the most reliable basis for determining their bad debt reserves. What is more, the petitioners' actual loss experience rarely exceeded 2 percent; yet, for virtually all of the years at issue, they maintained reserves of 4 or more percent. We are certainly not convinced that the Commissioner acted arbitrarily or unreasonably in relying upon the Black Motor *487 formula in this case. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners have been consolidated herewith: Community Acceptance Corporation of Donaldsonville, docket No. 21191-82; Time Acceptance of Zachary, Inc., docket No. 21192-82; Gonzales Acceptance Corporation, docket No. 21193-82; Community Acceptance Corporation, docket No. 21194-82; Community Acceptance Corporation of Baton Rouge, docket No. 21195-82; Delta Acceptance Corporation, docket No. 21196-82.↩
2. The figures on the petitioners' tax returns and the figures on the petitioners' accountant's workpapers do not always coincide. The workpapers were prepared on the basis of financial accounting principles; the petitioners' tax returns were prepared on the basis of tax accounting principles; and some of the differences in the figures may be due to differences in such principles. The petitioners' accountant prepared his workpapers after consultation with the management.↩
3. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
4. During the years at issue, the petitioners' ratios of reserves to total delinquent accounts ranged from 25.75 percent to 66.33 percent.↩
5. In Norfolk Industrial Loan Association v. United States, an unreported case ( E.D. Va. 1970, 70-2 U.S.T.C. par. 9527, 26 A.F.T.R.2d 70↩-5296), the taxpayer's bad debt reserve was in fact less than 30 percent of its total delinquent accounts during the first year at issue and less than 30 percent in the second year at issue.