**ROTH STEEL TUBE COMPANY,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 77-1588.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1979.

Decided May 8, 1980.

Bennet Kleinman, Laurence Glazer, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for petitioner-appellant.

M. Carr Ferguson, Joseph L. Liegl, Michael L. Paup, Asst. Attys. Gen., Tax Div., U.S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondeñt-appellee.

Before CELEBREZZE, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Petitioner Roth Steel Tube Company (Roth) appeals from the Tax Court's ruling disallowing a deduction of $172,443 as an addition to Roth's reserve for bad debts for the tax year ended April 30, 1972.[1] We affirm.

## I.

In its tax year ended April 30, 1972, Roth charged $172,443 against its reserve for bad debts in connection with the partial write-off of an account receivable. At the time that Roth attempted to charge off the $172,443 debt, its debtor was also its wholly owned subsidiary, operating under the name Roth American (American). American was acquired by Roth effective April 30, 1971. For 15 to 20 years prior to this acquisition, American was a substantial customer of Roth's, purchasing steel tubing for use in its toy manufacturing business. Roth acquired American from its parent corporation, Remco Industries. As a wholly owned but separate corporate subsidiary of Remco, American operated under the name Remco American.

The events leading up to Roth's acquisition of American are the same events which are claimed to justify the write-off of American's debt to Roth. Those events unfolded as follows.

In January of 1971, Remco Industries filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. Remco's petition stated that a similar petition would subsequently be filed on behalf of its subsidiary, Remco American. However, Herbert Gurbst, an officer of American was convinced that the subsidiary could be turned around, and he dissuaded the officers of Remco Industries from filing a petition for American.

In order to revitalize American, Gurbst attempted to find a financially sound company to purchase American from Remco Industries, and to convince American's major creditors to forgive part of the debts owed by American. The negotiations with creditors and the search for a purchaser were inter-related, as potential purchasers were wary of acquiring a company with the substantial backlog of debts then owed by American. Gurbst's goal was to find a purchaser by the end of April, 1971, so that toy retailers would place Christmas orders for toys, assured that American would not fold in the interim.

Roth was American's largest creditor, and on April 1, 1971, Leonard Roth, then president of petitioner, wrote to Gurbst as follows:

Having done business with you for 15 years, I certainly want to be of any help I can. You are asking me to sacrifice a lot of money by taking some kind of settlement. I would agree with several conditions.

(1) I will accept the 32½% settlement if I get it on or before June 1, 1971 and payment in full by certified check.

(2) I will only accept it if·you assure me that you will be involved in the management of whatever company exists that is now called Remco American.

---

1. Roth's total claimed deduction for addition to its reserve for bad debts was $178,656, all of which was disallowed. Roth does not challenge on appeal the disallowance of the $6,213 which was unconnected to the American debt.

(3) My only hope of getting back the money I am sacrificing is the continuation of your operation and having you as a customer.

If this is acceptable to you, and the people you are talking to, use this letter as your authority to quote me on the 32½% settlement.

By mid-April Gurbst had not yet found an acceptable purchaser for American.[2] On April 14, 1971, Gurbst and Leonard Roth first discussed the possibility of Roth Steel Tube acquiring American. At some time between April 15 and April 26, 1971, Roth agreed to acquire all the stock of American from Remco Industries. Roth and Remco signed a formal agreement, effective April 30, 1971, and they closed the transaction on May 3, 1971. Roth subsequently changed the name of the acquired company to Roth American.

During the last ten days of April, 1971, Gurbst received written settlement agreements from several of American's larger creditors. The individual agreements varied considerably, forgiving from 30% to 50% of American's outstanding debt, with disparate payment terms for the remainder.

On April 30, 1971, Roth's accounts receivable showed a total of $327,500.10 as the balance due from American. This represented American's total debt to Roth before any bad debt write-offs. On September 30, 1971, Roth transferred this amount from its accounts receivable into a special account. During the tax year ended April 30, 1972, American paid approximately $500,000 to Roth on account. Approximately $150,000 was applied against the amount due on the special account, and the rest was applied against current accounts receivable. On March 31, 1972, Roth charged the amount remaining in the special account, $172,443, against its bad debt reserve as a partially worthless debt from its subsidiary, American.

Roth claimed the $172,443 as a deduction for an addition to its bad debt reserve for its tax year ending April 30, 1972. The Commissioner disallowed the deduction as not "reasonable" to the extent that it was necessitated by the charge of American's debt against the bad debt reserve, and the Tax Court upheld his decision. The court found that "Petitioner's addition to its reserve for bad debts for the taxable year ended April 30, 1972, was not a reasonable addition to such reserve, and respondent did not abuse his discretion in so determining."

II.

Section 166 of the Internal Revenue Code of 1954 (26 U.S.C. § 166) governs the deductibility of bad debts. Section 166(a)(1) sets forth the general rule that a taxpayer may deduct "any debt which becomes worthless within the taxable year." A more limited allowance is made for debts which become only partially worthless. Section 166(a)(2) provides that the Commissioner "may allow" a deduction for a partially worthless debt "[w]hen [he is] satisfied that a debt is recoverable only in part." Section 166(c) permits a taxpayer to use the vehicle of a bad debt reserve as an alternative to directly deducting bad debts in the year they become worthless. This section provides that "[i]n lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the [Commissioner]) a deduction for a reasonable addition to a reserve for bad debts."

A bad debt reserve is an estimate of the future losses which are expected to result from current business debts. *See Smoot Sand & Gravel v. Commissioner*, 274 F.2d 495, 501 (4th Cir. 1960). The taxpayer is permitted to take a deduction when he makes a "reasonable addition" to the reserve rather than when a particular debt becomes worthless. When a debt becomes worthless, the taxpayer reduces the reserve by the amount of the worthless debt. A

---

**2.** The April 30, 1971 deadline set by Gurbst was apparently a major stumbling block in finding purchasers. A number of companies contacted by Gurbst reportedly expressed some interest in acquiring American, but those companies which were publicly held could not consummate a purchase so quickly.

"reasonable addition" to the reserve "is the amount necessary to bring the reserve balance up to the level that can be expected to cover losses properly anticipated on debts outstanding at the end of the tax year." *Thor Power Tool v. Commissioner*, 439 U.S. 522, 546, 99 S.Ct. 773, 788, 58 L.Ed.2d 785 (1979). Because a bad debt reserve is an estimate of future losses, the taxpayer will not invariably increase the reserve by the amount of the debts which became worthless in a given year. However, absent unusual circumstances, the amount of worthless debts for one year will indicate the expected amount for the next year, and thus one year's worthless debts will often approximate that year's reasonable addition to the bad debt reserve.[3]

Section 166(c) allows a deduction for an addition to a bad debt reserve "in the discretion" of the Commissioner. This grant of discretion limits the scope of judicial review over the Commissioner's determinations. In *Thor Power Tool, supra,* the Supreme Court summarized the interpretation which the courts have given this statutory language as follows:

> [T]he courts uniformly have held that the Commissioner's determination of a "reasonable" (and hence deductible) addition must be sustained unless the taxpayer proves that the Commissioner abused his discretion. The taxpayer is said to bear a "heavy burden" in this respect. He must show not only that his computation is reasonable but also that the Commissioner's computation is unreasonable and arbitrary.

439 U.S. at 547–48, 99 S.Ct. at 789 (footnotes omitted). Roth employs the reserve method of accounting for bad debts and it

must therefore bear this "heavy burden" to prevail in this appeal.

### III.

The Commissioner maintains, and the Tax Court found, that Roth did not show that the $172,443 in question was uncollectible. The court reasoned that Roth's cancellation of American's debt was a voluntary action on Roth's part, which in effect constituted a capital contribution from Roth to its wholly owned subsidiary, American. Roth seeks to justify the deduction on the ground that the debt became uncollectible to the extent of $172,443, as a result of both its settlement agreement with American, and American's insolvency.

If, as the Commissioner claims, American's debt to Roth did not become partially worthless, it would not operate to reduce Roth's bad debt reserve. If the reserve were not diminished by the $172,443, an addition to the reserve of that amount would be unnecessary, and the Commissioner's action would be supportable under the standards of Section 166(c).[4] The crucial inquiry therefore is whether the debt owed to Roth by American became partially worthless in the amount of $172,443 in the tax year ending April 30, 1972. As indicated above, the standard of review dictated by Section 166(c) is whether the Commissioner's disallowance is "unreasonable and arbitrary." *Thor Power Tool Co., supra,* 439 U.S. at 548, 99 S.Ct. at 789. This court noted the difficulty of meeting this standard in *Akron Nat'l. Bank v. United States:*

> Certainly the plaintiff has shown that the method it used in determining the

---

**3.** In *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court approved the "six-year moving average" formula for computing a reasonable addition to a bad debt reserve which was derived from the decision in *Black Motor Co. v. Commissioner,* 41 BTA 300 (1940), *aff'd on other grounds,* 125 F.2d 977 (6th Cir. 1942). The Court explained that "[t]his formula seeks to ascertain a 'reasonable' addition to a bad-debt reserve in light of the taxpayer's recent chargeoff history." 439 U.S. at 547, 99 S.Ct. at 788.

**4.** The Tax Court found that without the charge off of the $172,443 debt, Roth's bad debt experience totaled only $45,553 in the six-year period ending April 30, 1972, an average of less than $7,600 per year. The court found that without the diminution attributable to the $172,443 write-off, Roth's existing reserve was more than sufficient based on its past experience.

amount to be added to its bad debt reserve was reasonable, but this is irrelevant. It does not follow that if the plaintiff was reasonable in its determination the defendant was unreasonable.

510 F.2d 1157, 1161 (6th Cir. 1975), *quoting Paramount Finance Co. v. United States*, 304 F.2d 460, 464, 157 Ct.Cl. 824 (1962).

The standard for determining whether a debt is partially worthless so as to reduce the bad debt reserve is identical to the criteria for allowing a direct deduction for a partially worthless debt under Section 166(a)(2). Both Section 166(a)(2) and Section 166(c) explicitly vest discretionary authority in the Commissioner. The Treasury Regulations promulgated under Section 166 provide the following guidelines for determining worthlessness:

§ 1.166–2. Evidence of worthlessness.

(a) *General rule.* In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.

(b) *Legal action not required.* Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166.

(c) *Bankruptcy.* — (1) *General rule.* Bankruptcy is generally an indication of the worthlessness of at least part of an unsecured and unpreferred debt.

. . . . .

§ 1.166–3. Partial or total worthlessness.

. . . [(a)(2)]

(iii) Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless and the part thereof which has been charged off.

Treas. Reg. 1.166–2, 3 (1973).

The Tax Court found that "there was no specific event in the corporate life of American establishing the worthlessness of any portion of its debt to petitioner with the degree of conclusiveness normally required for a bad debt deduction under Section 166." 68 T.C. 213, 219 (1977), citing *Estate of Pachella v. Commissioner*, 37 T.C. 347, 353 (1961), *aff'd* 310 F.2d 815 (3rd Cir. 1962). Roth claims that this factual determination is clearly erroneous, and that American's insolvency, and the arms length settlements of its debts provide the requisite proof that the debt in question was partially worthless.

■ In the Tax Court Roth relied principally upon his argument that $172,443 of the debt owed by American became uncollectible due to a "composition with creditors agreement." Roth contends that because other creditors relied upon its 32½% settlement in deciding to settle their claims against American, a binding composition agreement was reached, barring collection on the debt. The theory underlying a composition agreement is that each creditor's promise to discharge a debt owed him is consideration for the other creditors' discharges. We agree with the Tax Court's finding that no valid compromise agreement existed here. Gurbst merely negotiated a series of separate settlements. There is no indication in any of the settlement agreements that the creditor was premising his cancellation upon the concomitant action of any other creditor. Roth's April 1 letter was the first such written offer of settlement received by Gurbst. In making this offer, Roth was clearly not relying upon the specific promise of any other creditor. It is also significant that Roth never did, in fact, accept a 32½% payment as payment in full on the debt, nor did Roth require payment by certified check on or before June 1, 1971. Thus Roth obviously did not feel itself bound by the terms upon which the other creditors purportedly relied. Under those circumstances, the Commissioner can hardly be faulted for taking a similar view.

■ Roth alternatively argues that it entered into a binding agreement with

American which made the debt uncollectible to the extent of $172,443. The general rule at common law is that a creditor's unilateral promise to accept less than the full amount due from a debtor in discharge of his debt is not enforceable for lack of consideration. *See* 1 Williston on Contracts (3rd ed.) §§ 120, 121. Roth is an Ohio corporation and therefore Ohio contract law applies. Although the Ohio Supreme Court has not considered this precise question, an Ohio municipal court, while following established Ohio precedent that "the acceptance of less than the amount presently or past due upon a liquidated and undisputed indebtedness in full payment thereof is not an accord and satisfaction," [5] nonetheless held that "an agreement to modify a contract is binding if supported by a new consideration, and mutual promises to modify the terms of the contract are sufficient consideration for each other." *Liberty Loan Corp. v. Schmelzer*, 48 Ohio Misc. 1, 356 N.E.2d 509, 510 (1976). However, even under this very liberal interpretation of the consideration requirement, we do not believe that Roth was contractually barred from pursuing collection of the $172,443 debt. As discussed above, the terms stated in Leonard Roth's letter were not carried out. Although Roth stated that he would accept a 32½% payment by June 1, 1971 in full discharge of the debt, American did not make any payments on the debt until September and October of 1971. It is apparent from the testimony at trial that the parties did not feel bound by any specific contract but instead were merely attempting to mollify other creditors who wished Roth to "take its lumps" along with them. If the parties did not intend a binding contract, we cannot say that the Commissioner was unreasonable in failing to find such a contract.

Moreover, we note that even if Roth was contractually barred from pursuing collection of this debt, a tax deduction for the amount of the debt would not necessarily be allowable. Our circuit recognized long ago that "[a] taxpayer may not of its own

act render a collectible debt uncollectible, charge off the debt as worthless, and then deduct it from income for purposes of taxation." *O'Bryan Bros. v. Commissioner*, 127 F.2d 645, 646 (6th Cir. 1942). *See also Loewi v. Commissioner*, 232 F.2d 621, 625 (7th Cir. 1956); *Bratton v. Commissioner*, 217 F.2d 486, 489 (6th Cir. 1954); *Ligget's Estate v. Commissioner*, 216 F.2d 548, 550 (10th Cir. 1954). The creditor must show that the debt in question was in fact worthless.

Roth claims that even if it was not contractually barred from seeking collection of the debt, American's insolvency proves the uncollectibility of the debt. Definitions of insolvency vary, and whether American was, in fact, insolvent during the relevant periods is not entirely clear. American's liabilities exceeded its assets on its balance sheet for June 30, 1970. The Commissioner points out, however, that the fair market value of those assets is not shown. In the fiscal years ending in 1971 and 1972 assets exceeded liabilities, but this is assertedly due to the account settlements with creditors. American experienced net operating losses for all of the years in question, but in 1972, under Roth's control, American's gross sales and sales on account increased. It was in the tax year ended in 1972 that Roth wrote off the debt. In that year, American's assets exceeded its liabilities, its business was expanding, and American had sound financial backing from Roth, its owner. American actually paid Roth more than $500,000 on account during the tax year ended April 30, 1972, and Roth filled American's orders without any restrictions during that period. In short, American's future appeared quite promising in the year Roth claimed the bad debt deduction, and Roth, as American's owner, was intimately aware of this promising future.

■ We need not decide whether American was legally insolvent when the bad debt was written off, for insolvency is relevant only as an indicium of uncollectibility.

---

5. See *Huo Chin Yin v. Amico Products Co.*, 141 Ohio St. 21, 46 N.E.2d 610 (1943); *Williams Furniture Corp. v. Arcade Furniture Store*, 84 Ohio App. 210, 82 N.E.2d 926 (1948).

Where a debtor company continues to operate as a going concern the courts have often concluded that its debts are not worthless for tax purposes despite the fact that it is technically insolvent. *See, e. g., Riss v. Commissioner,* 56 T.C. 388, 408 (1971), *aff'd sub nom. Commissioner v. Transport Mfg. & Equipment Co.,* 478 F.2d 731 (8th Cir. 1973); *Roussel v. Commissioner,* 37 T.C. 235, 245 (1961); *Trinco Industries, Inc. v. Commissioner,* 22 T.C. 959, 965 (1964). Such a conclusion is especially justified where, as here, the taxpayer continued to extend open credit to the debtor, and the debtor continued to make payments on his account.

■ Roth does not and could not claim that American's debt to it was completely worthless. Instead it claims partial worthlessness to the extent of $172,443. The Treasury Regulations promulgated pursuant to section 166 state that "[b]efore a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless." Treas. Reg. § 1.166–3 (1973). Roth must show that a specific amount of American's debt became worthless. Of the approximately $500,000 in payments American made to Roth during the tax year, approximately $150,000 was allocated to the "special account" formed when Roth acquired American. The remaining balance in the special account at the end of the tax year was written off as a bad debt. Roth's own allocation of payments is not in itself sufficient to earmark a certain amount as uncollectible. The focus must be the debtor's ability to pay, not the creditor's bookkeeping allocations.

Although the debtor's insolvency will often be enough to justify a creditor's bad debt write-off, the cancellation of the debt must be due to its worthlessness. When the parties are not dealing at arms length and the creditor stands to benefit from the cancellation, the worthlessness of the debt in the amount claimed must be clearly established. Roth benefited from its cancellation of American's debt, because the cancellation directly increased the net worth of its subsidiary. Judge (now Justice) Stewart co-gently explained the effect of a shareholder-creditor's voluntary cancellation of a debt owed by his controlled corporation in *Bratton v. Commissioner, supra,* 217 F.2d at 489:

> It is well recognized that where a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction generally amounts to a contribution to the capital of the corporation.

> .    .    .    .    .

> A worthless debt implies the existence of an obligation which cannot be collected. Here, to the extent that the obligation itself was extinguished by the voluntary act of the petitioner, there remained no debt at all.

> .    .    .    .    .

> What is a contribution to capital is not a loss at the time it is made. Loss, if any is eventually realized, will occur at the time petitioner's shares in the corporation are sold or become totally worthless.

*See also Finkel v. Commissioner,* 295 F.2d 840 (1st Cir. 1961).

■ We recognize that a creditor's decision in the exercise of good business judgment to cancel debts outstanding from a financially troubled customer must be accorded considerable respect. A business person's judgment on purely business matters should normally be better than the tax collector's. By authorizing a deduction for partially worthless debts in some circumstances Congress has recognized the need for sensible accommodation between debtors and creditors. We agree with Roth that a debtor should not be required to endure bankruptcy before creditors may write off his debts. However, Congress vested the Commissioner with broad discretion in this area, recognizing that difficult decisions would have to be made, and choosing to place the burden on the taxpayer. The specific trouble here is that the transaction in question was never purely at arms length. The opportunities for abuse of the bad debt deduction are apparent if a parent corporation is permitted to freely designate a portion of its subsidiary's debts to it as

"worthless," deduct that amount and at the same time increase the worth of its holdings. For this reason the uncollectibility of the debt in the amount claimed must be clearly shown.

█ The taxpayer has not carried the heavy burden necessary to show that the Commissioner abused his discretion in disallowing the deduction for an addition to the taxpayer's bad debt reserve, or that the Tax Court's findings were clearly erroneous. Because we find that Roth did not show that the debt was uncollectible to the extent of $172,443, we need not address the secondary question of the year in which any such charge-off should have been made.

Affirmed.