BLACK GOLD ENERGY CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 783–89.  Filed October 15, 1992.

*Fred W. Schwendimann,* for petitioner.
*Pamelya P. Herndon,* for respondent.

HAMBLEN, *Chief Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE | Deficiency |
| --- | --- |
| Oct. 31, 1978 | $11,373 |
| Oct. 31, 1979 | 9,119 |
| Oct. 31, 1980 | 42,059 |
| Oct. 31, 1981 | 200,209 |
| Oct. 31, 1983 | 31,020 |
| Oct. 31, 1984 | 143,724 |

The issues for decision are: (1) Whether petitioner, an accrual basis taxpayer, may claim a deduction for a bad debt loss under section 166 in its 1984 taxable year as guarantor of another's debts even though petitioner made no payment on its obligation until 1985; and (2) whether petitioner's delivery of a note in settlement of its guaranty obligation constitutes payment for purposes of section 166.[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference.

Petitioner is a corporation duly organized and existing under the laws of the State of New Mexico. From its inception in 1958, until its name change in 1984 to Black Gold Energy Corp., petitioner did business under the corporate name Ray Bell Oil Co. of Roswell. At the time the petition was filed in this case, petitioner's principal place of business was Roswell, New Mexico. Petitioner is an accrual basis taxpayer with a taxable year beginning November 1 and ending October 31.

One of petitioner's assets during the years at issue was a controlling interest in Tonkawa Refinery of Oklahoma (Tonkawa). As of July 1, 1978, petitioner owned a 66.67-per-

---

[1] This issue of whether petitioner is entitled to accrue the entire amount of its guaranty obligation in 1985 arises as a result of carryforwards and carrybacks from and to the fiscal years at issue.

cent interest in Tonkawa. Tonkawa was a Texas corporation which operated a refinery in Arnett, Oklahoma.

On April 8, 1982, Tonkawa entered into a refinery equipment sales agreement with Conoco Oil Co. (Conoco) to purchase refining equipment for $4,825,000. Conoco financed the sale of the refinery equipment. On April 5, 1982, prior to the date the sales agreement was executed, petitioner guarantied all of the principal and interest payments due to Conoco pursuant to the sales agreement. The terms of the guaranty agreement did not provide petitioner with a right of subrogation against Tonkawa.

According to the sales agreement, Tonkawa was to dismantle the refinery equipment and transport the equipment from Conoco's premises at Tonkawa's expense. Tonkawa's dismantling and transportation expenses as well as other refinery operation expenses were financed by the First National Bank and Trust Co. of Oklahoma City (First National Bank). In addition to First National Bank's security interest in Tonkawa's real and personal property, petitioner guarantied the debt that Tonkawa incurred with First National Bank. The terms of the guaranty agreement did not provide petitioner with a right of subrogation against Tonkawa. As of December 5, 1983, there was a $39 million loan outstanding pursuant to the loan agreement with First National Bank. The balance consisted of a term note in the original principal amount of $8 million and a revolving note in the original principal amount of $31 million. The loan was reduced to $15,763,651.31 by September 24, 1984.

Tonkawa defaulted on the payments due to First National Bank on or about April 30, 1984. Tonkawa defaulted on its payments due to Conoco on July 2, 1984, with respect to interest, and on July 6, 1984, with respect to principal. Tonkawa's refinery operations terminated during May 1984. On September 14, 1984, Tonkawa filed for bankruptcy. The bankruptcy case was subsequently dismissed on March 30, 1989.

On September 25, 1984, both First National Bank and Conoco filed suit against petitioner in order to recover under petitioner's guaranties of Tonkawa's indebtedness. On or before January 5, 1985, petitioner and Conoco agreed to settle the suit for $850,000. Conoco assigned the sales agreement to Pecos Refining Corp., an unrelated corporation, for

$850,000 on January 4, 1985. The $850,000 payment was made on January 5, 1985.

On January 18, 1985, petitioner and First National Bank agreed to settle the suit. Petitioner and First National Bank entered into a settlement agreement on February 7, 1985. Under the terms of the settlement agreement, petitioner delivered a note to First National Bank in the principal sum of $3,850,000, bearing interest at 8 percent per annum. The note provides an 8-year repayment schedule with monthly installments of $50,000. Petitioner made the first $50,000 installment on June 5, 1985.

On its 1984 corporate tax return for the year ending October 31, 1984, petitioner claimed a $4,700,000 bad debt loss in connection with the guarantied debts ($3,850,000 due to First National Bank plus $850,000 due to Conoco). Respondent disallowed the deduction for 1984 but allowed petitioner an $889,577 deduction for bad debt losses in 1985, consisting of $39,577 in principal payments made pursuant to the guaranty agreement with First National Bank and the $850,000 payment made pursuant to the guaranty agreement with Conoco. Respondent also allowed petitioner a deduction for bad debt losses in the amount of $305,241 for 1986 for payments made pursuant to the guaranty agreement with First National Bank.

OPINION

This case presents the question of when an accrual basis guarantor is entitled to claim a deduction for a bad debt loss relating to its guaranty obligations. The parties have presented numerous arguments relying on sections 166 and 461. Primarily, petitioner contends that section 461 is the controlling law of this case and that an accrual basis taxpayer does not have to make actual payment on its guaranty obligation as a precondition to deducting a bad debt loss under section 166. Further, petitioner contends that under section 461 an accrual basis guarantor may deduct a bad debt loss in the year in which all the events have occurred which fix the guarantor's liability as primary obligor. Petitioner contends that it became primarily liable on its guaranty agreements when Tonkawa defaulted on its obligations to First National Bank and Conoco in April 1984 and July 1984, respectively.

At that point, petitioner contends that it was entitled to deduct as a bad debt loss the aggregate amount of its liability, $4,700,000.

Respondent contends that petitioner is not entitled to a deduction for a bad debt loss under section 166 for 1984 because there was no debt in existence between Tonkawa and petitioner during 1984.[2] Relying on *Putnam v. Commissioner,* 352 U.S. 82 (1956), respondent contends that petitioner was not a creditor until petitioner paid all or part of the debt pursuant to the guaranty agreements. Since petitioner did not make any payments until 1985, respondent concludes that the earliest time in which petitioner was entitled to claim a deduction for a bad debt loss was in 1985.

We see this case as presenting two issues: First, whether section 166 and the regulations promulgated thereunder require a guarantor to make actual payment as a precondition to claiming a bad debt loss; and if so, second, whether the substitution of a note constitutes payment for purposes of section 166.

Section 166 allows a deduction for the loss suffered on account of a bad debt. A deduction is allowed to the extent that the debt becomes worthless within the taxable year. Sec. 166(a). Losses of guarantors are subject to particular conditions of deductibility. See sec. 1.166-9, Income Tax Regs.

In *Putnam,* the Supreme Court held that the loss sustained by a guarantor unable to recover from the debtor is a loss from a bad debt. The Supreme Court reached that conclusion by reasoning as follows: the guarantor pays the creditor under the obligation arising from the contract of guaranty; the guarantor's loss arises not on account of such payment but on account of the debtor's inability to reimburse him; the debtor is indebted to the guarantor by application of the doctrine of subrogation, under which a guarantor who is required to make payment under his guaranty contract succeeds to the rights of the creditor.[3] *Id.* at 84, 88-89. As the Court explained:

---

[2] Respondent did not contend that the debt was a nonbusiness bad debt under sec. 166(d). Therefore, we assume that the debt qualifies as a business bad debt and the only issue before the Court is the appropriate timing of the bad debt loss deduction under sec. 166(a).

[3] The Supreme Court described the legal fiction of subrogation as follows:

The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who

The reality of the situation is that the debt is an asset of full value in the creditor's hands because backed by the guaranty. The debtor is usually not able to reimburse the guarantor and in such cases that value is lost at the instant that the guarantor pays the creditor. But that this instant is also the instant when the guarantor acquires the debt cannot obscure the fact that the debt "becomes" worthless in his hands. [*Id.* at 89.]

*Putnam* primarily addressed the issue of the characterization of a guarantor's deduction as either an ordinary deduction for a business loss or as a short-term capital loss deduction for a worthless bad debt. Compare sec. 165(c)(2) with sec. 166(d). Subsequent to the holding in *Putnam* many taxpayers tried in vain to qualify for the preferential ordinary loss treatment of section 165 by insuring that they did not have a right of subrogation against the borrower if the borrower defaulted. See *In re Vaughan,* 719 F.2d 196 (6th Cir. 1983); *Horne v. Commissioner,* 523 F.2d 1363 (9th Cir. 1975), affg. 59 T.C. 319 (1972); *Stratmore v. United States,* 420 F.2d 461 (3d Cir. 1970); *Stoody v. Commissioner,* 66 T.C. 710, 715 (1976). The courts held that, even without the existence of a technical right of subrogation, a guarantor's loss is in the nature of a bad debt loss, and, thus, is subject to the bad debt regime of section 166. *Martin v. Commissioner,* 52 T.C. 140 (1969), affd. 424 F.2d 1368 (9th Cir. 1970); *In re Vaughan, supra; Stratmore v. United States, supra.*

In *Martin,* we interpreted *Putnam* as establishing a broad rule that "payments in discharge of a guaranty are normally to be *treated as* bad debt losses." *Martin v. Commissioner, supra* at 144. Thus, whether a guarantor achieves technical subrogation or not, the guarantor's loss arises by virtue of the worthlessness of the debtor's obligation to the guarantor. Consistent with *Putnam* and *Martin,* section 1.166-9(a), Income Tax Regs., provides as follows:

(a) *Payment treated as worthless business debt.* \* \* \* Subject to the provisions of paragraphs (c), (d), and (e) of this section, a *payment* \* \* \* by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor \* \* \* is treated as a business debt becoming worthless in the taxable year in which the *payment* is made or in the taxable year described in paragraph (e)(2) \* \* \* [Emphasis added.[4]]

---

steps into the creditor's shoes. \* \* \* [*Putnam v. Commissioner,* 352 U.S. 82, 85 (1956); fn. ref. omitted.]

[4] If a guaranty agreement provides for a right of subrogation, sec. 1.166-9(e)(2), Income Tax Regs., provides that the guarantor's payment is not treated as a worthless debt until the tax

Section 1.166-9(a), Income Tax Regs., specifies that, with regard to the discharge of a guarantor's obligation, a "payment" is treated as a debt becoming worthless "in the taxable year in which the payment is made". That regulation is unambiguous; moreover, the payment rule contained therein is consistent with the rationale of *Putnam* in that, until a payment is made, the guarantor's obligation remains undischarged (in at least an amount equal to the payment) and (with regard to that undischarged obligation) there is no indebtedness running to the guarantor that has the potential of being worthless. Rules of tax accounting have little, if anything, to do with that result. Until a payment is made, and the guarantor is discharged of his liability, the debt in question is, under the rationale of *Putnam,* and assuming a solvent guarantor, immune from worthlessness. By definition the debt is not worthless; how it is otherwise accounted for simply is of no relevance.

Pursuant to *Putnam, Martin,* and section 1.166-9(a), Income Tax Regs., a guaranteed obligation is worthless no earlier than the moment the guarantor pays the creditor. A guarantied debt cannot become worthless prior to the guarantor's payment, even if, as in *Putnam,* it is indisputable that the debtor never would reimburse the guarantor. Petitioner made no payments to either Conoco or First National during its 1984 taxable year. Accordingly, we agree with respondent that no bad debt deduction is available to petitioner prior to the end of its 1984 tax year.

Tonkawa defaulted on its obligations to First National Bank and Conoco during petitioner's 1984 tax year. Petitioner had agreed to act as guarantor of those obligations. In settlement of a suit brought to enforce the guaranty to Conoco, petitioner paid $850,000 on January 5, 1985. Pursuant to section 1.166-9(a), Income Tax Regs., petitioner is entitled to deduct $850,000 as a bad debt in its 1985 taxable year.

In settlement of a suit brought to enforce the guaranty to First National Bank, petitioner, on February 7, 1985, delivered to the bank its note in the principal sum of $3,850,000. During its 1985 tax year, petitioner made principal payments on the note in the amount of $39,577. Respondent has

_____

year in which the right of subrogation becomes totally worthless. Neither of the guaranty agreements in this case provided for a right of subrogation. Therefore, sec. 1.166-9(e)(2), Income Tax Regs., is not relevant for purposes of our analysis.

allowed petitioner a deduction for 1985 in that amount. We agree with respondent that a deduction for the actual payment in 1985 is all that petitioner is entitled to.

We now consider whether the transfer of the note constitutes payment for purposes of section 166. Petitioner transferred a note to First National Bank during 1985 as provided for in the settlement agreement. The rule for a cash basis guarantor is well established: a personal note does not constitute an outlay permitting a worthless debt deduction by the guarantor until the note is paid.[5] *Perry v. Commissioner,* 49 T.C. 508 (1968); see *Eckert v. Burnet,* 283 U.S. 140 (1931); *Crown v. Commissioner,* 77 T.C. 582 (1981). We find no reason why this rule should not apply to accrual basis guarantors.

Where the guaranty is contested, as it was in this case, the note may serve to settle any uncertainty as to the guarantor's obligation. It may also serve to give the creditor added liquidity or security. However, given the rationale of *Putnam* and *Martin,* the note cannot, until the guarantor makes payment on it, precipitate the debtor's obligation to the guarantor, which, after all, is the obligation whose worthlessness gives rise to a bad debt deduction to the guarantor.

Consequently, we hold that addition of a guarantor's note to a contractual guaranty obligation does not constitute payment for purposes of section 166. Therefore, pursuant to the above analysis, beginning in 1985 petitioner is entitled to deduct as a bad debt loss any amount actually paid to Conoco or First National Bank pursuant to the respective guaranty obligations.

We have considered the parties' remaining arguments and find them without merit. Because we have determined that section 166 limits the deduction for bad debt losses to the amounts actually paid by a guarantor regardless of the guarantor's method of accounting, the arguments concerning the applicability of section 461 are irrelevant to our determination, and consequently, need not be addressed.

---

[5] *Bernstein v. Commissioner,* T.C. Memo. 1989-422; see also *Yamamoto v. Commissioner,* T.C. Memo. 1990-549, affd. 958 F.2d 380 (9th Cir. 1992).

To reflect the foregoing,

*Decision will be entered for respondent.*