106 T.C. No. 16


UNITED STATES TAX COURT


INTERGRAPH CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21286-93.                    Filed May 8, 1996.


<u>Held</u>:  Among other things, petitioner, in the year
of payment, is not entitled to a claimed sec. 166,
I.R.C., bad debt deduction with respect to its payment
as guarantor of a Japanese-yen-denominated loan made to
a Japanese subsidiary corporation.  Where a guarantor
has a right of subrogation against, or a right of
reimbursement from, the primary obligor (regardless of
whether that right is expressly stated in the guaranty
agreement), the provisions of sec. 1.166-9(e)(2),
Income Tax Regs., apply, and the guarantor is not
entitled to a bad debt deduction until the right of
subrogation, or the right of reimbursement, is shown to
be worthless.

James R. McCann, David G. Glickman, Geoffrey R. Polma, and Sally C. Helppie, for petitioner.

Gary F. Walker, Kim Palmerino, and William T. Lundeen, for respondent.

SWIFT, Judge:  Respondent determined a deficiency of $978,567 with respect to Intergraph Corp. (Intergraph) and its subsidiaries' consolidated 1987 Federal income taxes.

After concessions, the issues for decision are:  (1) The deductibility of a claimed $1,923,103 foreign currency loss and of a claimed $520,432 interest expense; and (2) if the first issue is decided against petitioner, the deductibility in the year of payment of a $6,484,169 bad debt deduction claimed with respect to a payment Intergraph made of a Japanese-yen-denominated debt obligation.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1987.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, Intergraph was a publicly held Delaware corporation with its principal place of business in Huntsville, Alabama.  During the relevant years, Intergraph was the common parent of a group of affiliated corporations engaged in the business of designing, manufacturing, and marketing computer graphics and data base management systems.

In the early and mid 1980's, Intergraph's business grew rapidly in the United States and in Europe. Outside the United States, Intergraph conducted most of its business through foreign subsidiaries. Intergraph and its U.S.-based affiliated companies used the U.S. dollar as its functional currency.

On May 14, 1985, Intergraph in Japan organized Nihon Intergraph KK (Nihon Intergraph) as a wholly owned, third-tier subsidiary to market, sell, and service Intergraph's products. Nihon Intergraph's principal place of business was located in Tokyo, Japan, and Nihon Intergraph used the Japanese yen as its functional currency.

The Japanese market constituted the third largest market in the world for the type of products developed by Intergraph, and a number of Japanese nationals were hired from Intergraph's chief competitor in Japan to manage Nihon Intergraph. Intergraph representatives expected that within Nihon Intergraph's first year of operation Nihon Intergraph would be profitable.

Upon Nihon Intergraph's organization, Intergraph contributed to Nihon Intergraph ¥100 million ($392,000)[1] as paid-in capital.

Nihon Intergraph representatives estimated to personnel at Citibank Tokyo that Nihon Intergraph would have sales revenue in

---

[1] Unless otherwise indicated, parenthetical references to U.S. dollars represent references either to Intergraph's or to Nihon Intergraph's historical U.S. dollar cost for the referred-to Japanese yen or to the historical U.S. dollar equivalent for the referred-to Japanese yen.

1985 of approximately ¥800 million and in 1986 of approximately ¥2 billion.

Substantially all of the banking needs of Intergraph and of its domestic and foreign subsidiaries were provided by Citicorp, Inc. (Citicorp), and by Citicorp's banking and financial subsidiaries. Intergraph's banking relationship with Citicorp was maintained primarily through Citicorp North America's[2] office located in Atlanta, Georgia (Citicorp Atlanta). Nihon Intergraph's banking relationship was maintained primarily through Citibank, N.A.[3]

On June 7, 1985, representatives of Nihon Intergraph entered into an overdraft agreement (Overdraft Agreement) with representatives of the Tokyo office of Citibank, N.A. (Citibank Tokyo). Under the terms of the Overdraft Agreement, Nihon Intergraph was permitted to overdraw its yen-denominated checking account that was established at Citibank Tokyo by up to ¥300 million. This ¥300 million ceiling on the amount of the overdraft was not tied to or further limited by the dollar-yen exchange rate.

This overdraft privilege on Nihon Intergraph's checking account with Citibank Tokyo was intended to provide a short-term source of operating funds for Nihon Intergraph in the event Nihon

---

[2]    Citicorp North America, Inc., is a subsidiary of Citicorp.

[3]    Citibank, N.A., is a subsidiary of Citicorp.

Intergraph experienced cash-flow problems in its initial months of operation.

On the Overdraft Agreement, Nihon Intergraph was reflected as the debtor, and Citibank Tokyo was reflected as the creditor. Intergraph representatives did not sign, and Intergraph was not reflected as a debtor, as a co-obligor, as a guarantor, nor in any other capacity, on the Overdraft Agreement.

Due to Nihon Intergraph's affiliation with Intergraph and Intergraph's longstanding banking relationship with Citicorp, the interest rate that was to be charged Nihon Intergraph by Citibank Tokyo on the amount overdrawn on the checking account (overdraft amount) reflected the best available short-term interest rate. Interest that accrued on the overdraft amount was charged directly to Nihon Intergraph's checking account, thereby increasing the overdraft amount.

The overdraft amount was payable by Nihon Intergraph in yen on demand from Citibank Tokyo.

On June 28, 1985 (with regard to the overdraft amount and any other loans, advances, and overdrafts owed by Nihon Intergraph to Citibank Tokyo), Intergraph entered into a guaranty agreement (Guaranty Agreement) with Citibank, N.A., under which Intergraph, among other things, guaranteed to repay to Citibank, N.A., on demand the overdraft amount. The Guaranty Agreement was similar to agreements that Intergraph entered into on behalf of its other subsidiaries.

On several occasions, from June of 1985 through November of 1987, operating receipts of Nihon Intergraph in the total cumulative amount of ¥151,657,808 were deposited into Nihon Intergraph's checking account at Citibank Tokyo thereby reducing the balance of Nihon Intergraph's overdraft amount. In essence, the overdraft privilege on Nihon Intergraph's checking account at Citibank Tokyo operated as a short-term line of credit for Nihon Intergraph.

In 1985, 1986, and 1987, Nihon Intergraph did not perform as well as expected and incurred net operating losses. By the end of 1987, the overdraft amount, including principal and interest, had increased to ¥823,943,385 ($4,561,066).

The chart below reflects for 1985, 1986, and 1987 Nihon Intergraph's gross receipts, net losses, and the incremental increase that occurred each year in the yen and historical dollar equivalent balance of the overdraft amount.

|  |  |  | Increase in Balance of Overdraft Amount | |
| Year | Gross Receipts | Net Loss | Yen | Dollar* |
|------|---------|----------|-----|---------|
| 1985 | $ 823,000 | $1,535,000 | ¥361,572,000 | $1,631,724 |
| 1986 | 1,194,000 | 4,354,000 | 341,884,041 | 2,094,214 |
| 1987 | 226,000 | 2,146,000 | 120,487,344 | 835,128 |
| Total | $2,243,000 | $8,035,000 | ¥823,943,385 | $4,561,066 |

    * The dollar equivalent amounts reflected in this chart reflect historical dollar-yen exchange rates as they existed at the end of each year or at the end of each month in which an increase in the overdraft amount occurred, not the dollar equivalent based on the Dec. 23, 1987, exchange rate.

During 1985, 1986, and through November of 1987, on the books and records of Nihon Intergraph, of Intergraph, and of Citibank Tokyo, the principal and interest relating to the overdraft amount were treated as a yen-denominated debt obligation of Nihon Intergraph owed to Citibank Tokyo.

On Nihon Intergraph's 1985 and 1986 balance sheets, the overdraft amount was reflected as a debt obligation of Nihon Intergraph. The overdraft amount was not reflected as a debt obligation of Intergraph nor as a capital contribution from Intergraph to Nihon Intergraph.

For 1985, 1986, and through November of 1987, the overdraft amount was reported by Nihon Intergraph to Japanese tax and regulatory authorities as a debt obligation of Nihon Intergraph to Citibank Tokyo.

For 1985, the overdraft amount was reported by Intergraph on Form 5471 (Information Return with Respect to a Foreign Corporation filed with respondent in regard to Nihon Intergraph) as a debt obligation of Nihon Intergraph.[4] The overdraft amount was not reflected as a debt obligation of Intergraph, nor as a capital contribution from Intergraph to Nihon Intergraph.

For 1985, 1986, and through November of 1987, with regard to the overdraft amount, Intergraph reported to its stockholders and to the U.S. Securities and Exchange Commission (SEC) that

---

[4] Because Nihon Intergraph constituted a foreign corporation, it did not qualify as part of petitioner's consolidated group for purposes of filing a consolidated U.S. Federal income tax return.

Intergraph had guaranteed a debt obligation of Nihon Intergraph. During 1985, 1986, and 1987, Intergraph reported no increase in the amount of its capital contribution to Nihon Intergraph over and above its original ¥100 million ($392,000) initial capital contribution.

On its financial statements for 1985, 1986, and through November of 1987, Intergraph reflected no foreign currency exposure with regard to the outstanding balance of the overdraft amount.

From 1985 through the end of 1987, the dollar weakened dramatically against the yen -- dropping from $1:¥249 to $1:¥126. During 1985, 1986, and through November of 1987, at the end of each month, on Nihon Intergraph's (not Intergraph's) books and records, the amount of the monthly increase in the overdraft amount was assigned a historical dollar equivalent based on the then-prevailing exchange rate. As indicated above, on December 23, 1987, the historical dollar equivalent of the total ¥823,943,385 balance of the overdraft amount equaled $4,561,066.

As stated, however, based on the dollar-yen exchange rate that existed on December 23, 1987, the dollar equivalent of the ¥823,943,385 balance of the overdraft amount, as of December 23, 1987, equaled $6,484,169.

On or about December 23, 1987, based on a number of considerations, Intergraph representatives decided to eliminate the ¥823,943,385 balance of the overdraft amount. Accordingly,

on December 23, 1987, Intergraph purchased from Citibank, N.A.'s, New York City office ¥823,943,385 at a cost of $6,484,169 and transferred the yen into Nihon Intergraph's checking account at Citibank Tokyo. As a result, the ¥823,943,385 debit balance of Nihon Intergraph's checking account was reduced to zero. Nihon Intergraph did not draw any checks on the checking account thereafter, and the checking account was closed on April 20, 1988.

Although Citibank Tokyo apparently had concerns with regard to the large amount of the overdraft, neither Citibank, N.A., Citicorp Atlanta, nor Citibank Tokyo ever made a demand, pursuant to the Overdraft Agreement, for payment by Nihon Intergraph or by Intergraph of the balance, or of any portion of the balance, of the overdraft amount.

Similarly, neither Citibank, N.A., Citicorp Atlanta, nor Citibank Tokyo ever made a demand, pursuant to the Guaranty Agreement, for payment by Intergraph of the balance, or of any portion of the balance, of the overdraft amount.

After the transfer of the ¥823,943,385 into Nihon Intergraph's checking account, Nihon Intergraph continued to operate in Japan, and Intergraph provided additional funds to Nihon Intergraph through intercompany loans. As of the date of trial, Nihon Intergraph continues to operate in Japan.

On Nihon Intergraph's 1987 yearend financial statements, there was reflected an ¥823,943,385 increase in the intercompany

debt owed by Nihon Intergraph to Intergraph and a reduction to zero of Nihon Intergraph's third-party loan payable account (reflecting the fact that the overdraft amount had been paid off).  Nihon Intergraph's capital account continued to reflect only Intergraph's initial capital contribution of ¥100 million.

On Intergraph's 1987 yearend financial statement, Intergraph, in effect, was treated as subrogated to Citibank Tokyo's creditor rights with regard to the overdraft amount, and Intergraph's transfer of the ¥823,943,385 into Nihon Intergraph's checking account to eliminate the overdraft amount was reflected as an intercompany loan from Intergraph to Nihon Intergraph.

In March of 1988, on Nihon Intergraph's balance sheet attached to Intergraph's 1987 Form 5471 filed with respondent with respect to Nihon Intergraph, Nihon Intergraph's intercompany debt to Intergraph in the amount of ¥823,943,385 ($6,484,169) was reflected as paid off, and Intergraph's capital investment in Nihon Intergraph was reflected as increased by the same amount.

For Japanese reporting purposes for 1987, Nihon Intergraph's financial statements continued to reflect that Intergraph's payment of the overdraft amount gave rise to an intercompany debt to Intergraph.

On petitioner's 1987 consolidated Federal income tax return, however, petitioner treated the overdraft amount as a loan by Citibank Tokyo to Intergraph, not as a loan to Nihon Intergraph, and petitioner treated Intergraph's transfer of the ¥823,943,385

into Nihon Intergraph's checking account at Citibank Tokyo as giving rise to a $1,923,103 foreign currency loss under section 988 and to a $520,432 interest deduction under section 163(a).

The claimed $1,923,103 foreign currency loss was computed by subtracting from Intergraph's $6,484,169 cost of the ¥823,943,385 that it purchased on December 23, 1987, and transferred into Nihon Intergraph's checking account, the historical $4,561,066 equivalent of the overdraft amount as reflected on Nihon Intergraph's records. The $520,432 interest deduction that petitioner claimed was based on interest that had accrued and that was charged to the overdraft amount over the course of the prior 2-1/2 years.

On audit of petitioner's 1987 consolidated Federal income tax return, respondent determined that the overdraft amount should be treated as a loan by Citibank Tokyo to Nihon Intergraph, not as a loan to Intergraph, and thus that Intergraph's transfer of the ¥823,943,385 into Nihon Intergraph's checking account on December 23, 1987, should be treated as a capital contribution to Nihon Intergraph and that Nihon Intergraph, not Intergraph, should be treated as paying off the overdraft amount. Because the mere purchase of foreign currency to make a capital contribution to a corporation produces neither a foreign currency loss nor an interest expense, respondent disallowed Intergraph's claimed $1,923,103 foreign currency loss under section 988 and Intergraph's $520,432 claimed interest

deduction under section 163(a).  Respondent now argues that Intergraph was a mere guarantor of the overdraft amount and therefore that Intergraph is not entitled to the claimed foreign currency loss under section 988 and the claimed interest expense deduction under section 163(a).

OPINION

Foreign Currency Loss and Interest Expense

Generally, under section 988 a taxpayer is entitled to an ordinary loss deduction for a foreign currency loss arising from a "section 988 transaction".  Sec. 988(a)(1)(A).  Where a taxpayer is a primary obligor on a debt obligation that is denominated in a nonfunctional currency, repayment of the debt obligation generally qualifies as a "section 988 transaction".  Sec. 988(c)(1)(A) and (B).  A foreign currency loss occurs to the extent a loss is realized by reason of a change in the exchange rate between the obligor's functional currency and the nonfunctional currency from the date the obligor becomes obligated on the debt obligation to the date the obligor makes payment on the debt obligation.  Sec. 988(b)(2) and (c)(2)(A) and (3)(A).

On brief, petitioner notes that the provisions of section 988 and the legislative regulations thereunder do not expressly provide that a taxpayer's payment, as a mere guarantor, under a guaranty agreement would not qualify as a "section 988 transaction" giving rise to a recognizable foreign currency loss.

Petitioner and respondent, however, for purposes of this case, treat a payment, as a mere guarantor, under a guaranty agreement as not qualifying as a "section 988 transaction". See sec. 988(c)(1)(B)(i); sec. 1.988-1T(a)(2)(i), Temporary Income Tax Regs., 54 Fed. Reg. 38824 (Sept. 21, 1989).

As a general rule, under section 163(a), a taxpayer is permitted an interest expense deduction only if the interest represented a debt obligation of the taxpayer, and a guarantor is not entitled to an interest expense deduction with respect to payments made in fulfillment of a mere guaranty obligation. Hynes v. Commissioner, 74 T.C. 1266, 1287-1288 (1980).

Petitioner argues that Intergraph should be treated as the primary debtor or obligor on the overdraft amount and that the total ¥823,943,385 balance of the overdraft amount should be regarded as a loan made directly to Intergraph. Petitioner therefore argues that Intergraph, with regard to its payment of the overdraft amount, should be entitled to deduct under section 988 a $1,923,103 foreign currency loss and under section 163(a) a $520,432 accrued interest expense. Petitioner also argues that even if the overdraft amount is to be treated as a loan made to Nihon Intergraph, Intergraph should be regarded as a co-obligor on the loan and should be entitled to the foreign currency loss and interest expense deductions claimed under sections 988 and 163(a).

Alternatively, petitioner argues that if Intergraph is not entitled to the claimed foreign currency loss and interest expense deductions, Nihon Intergraph's obligation to reimburse Intergraph for Intergraph's payment of the overdraft amount should be treated as worthless, and Intergraph should be entitled for 1987 to a $6,484,169 bad debt deduction under section 166 with regard thereto.

Respondent argues that the form and substance of the transaction relating to the overdraft amount establish that the overdraft amount constituted a loan made to Nihon Intergraph, not to Intergraph. Respondent therefore argues that Intergraph should be treated as a mere guarantor of the overdraft amount and that Intergraph is not entitled to the claimed foreign currency loss and interest expense deductions.

Generally, whether the form of a loan made to a corporation should be disregarded and whether the loan should be treated as made to a shareholder of the corporation, followed by a capital contribution of the loan proceeds to the corporation, is resolved in light of traditional debt-equity principles. Santa Anita Consol., Inc. v. Commissioner, 50 T.C. 536, 550 (1968); Atkinson v. Commissioner, T.C. Memo. 1984-378. These principles include, among others, whether the debt obligation relating to the loan was subordinated to other debt obligations owed by the corporation, the creditworthiness of the corporation, the corporation's payment history on the loan, the prospects that the

corporation would pay off the loan, the extent to which the loan proceeds were used to acquire capital assets for the corporation, whether the corporation was thinly capitalized, and the intent of representatives of the corporation and of the shareholder.  See Selfe v. United States, 778 F.2d 769, 773 n.9 (11th Cir. 1985); In re Lane, 742 F.2d 1311, 1314-1315 (11th Cir. 1984); Georgia-Pac. Corp. v. Commissioner, 63 T.C. 790, 796-800 (1975); Atkinson v. Commissioner, supra.

No single factor is controlling, and each case is to be decided upon its own facts.  Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 719 (5th Cir. 1972), affg. T.C. Memo. 1970-182; Georgia-Pac. Corp. v. Commissioner, supra at 796; Blum v. Commissioner, 59 T.C. 436, 440 (1972).

We agree with respondent in this case.  The evidence is compelling that the overdraft amount should be treated as a loan made from Citibank Tokyo to Nihon Intergraph and not as a loan made to Intergraph.  Intergraph is to be regarded as a mere guarantor, and its payment of ¥823,943,385 on December 23, 1987, is to be regarded as a payment of Intergraph's obligation as guarantor under the Guaranty Agreement.  Accordingly, the foreign currency loss and the interest expense deductions claimed by Intergraph with regard thereto are disallowed.

The Overdraft Agreement created an unconditional debt obligation on the part of Nihon Intergraph to pay off the overdraft amount.  Intergraph was not even mentioned in the

Overdraft Agreement.  Throughout 1985, 1986, and through November of 1987, the overdraft amount was reported on Nihon Intergraph's financial statements as a debt obligation of Nihon Intergraph, and Nihon Intergraph reported to Japanese tax and regulatory authorities that the overdraft amount represented a loan from Citibank Tokyo to Nihon Intergraph.  On attachments to petitioner's 1985 and 1986 consolidated U.S. Federal income tax returns and on petitioner's 1985 and 1986 filings with the SEC, the overdraft amount was reflected as Nihon Intergraph's debt obligation that was guaranteed by Intergraph.  The overdraft amount was reflected on Nihon Intergraph's Japanese tax returns as a debt obligation of Nihon Intergraph.

Citibank Tokyo looked primarily to Nihon Intergraph for payment of the overdraft amount.

In 1985, 1986, and through November of 1987, not just the form but also the substance of the loan reflects a loan to Nihon Intergraph.  For example, if the substance of the loan constituted a loan made to Intergraph, Intergraph would have had to reflect and would have so reflected on its financial statements a foreign currency exposure with regard to the overdraft amount and, in all likelihood, Intergraph would have repaid the ¥823,943,385 directly to the creditor (namely, to Citibank Tokyo).  Intergraph would not have transferred the ¥823,943,385 into the checking account of Nihon Intergraph, an

allegedly insolvent corporation. These are economic matters not just of form but also of substance.

The evidence establishes that in both form and substance the overdraft amount should be treated as a loan from Citibank Tokyo to Nihon Intergraph and not as a loan from Citibank Tokyo to Intergraph.

Further, the evidence does not establish that, for purposes of section 988 and section 163(a), Intergraph should be treated as a co-obligor on the overdraft amount. The Overdraft Agreement lists Nihon Intergraph as the only obligor on the overdraft amount. Intergraph signed only the Guaranty Agreement and did not sign the Overdraft Agreement as co-obligor.

Petitioner relies on Larson v. Commissioner, 44 B.T.A. 1094 (1941), affd. 131 F.2d 85 (9th Cir. 1942), and Rev. Rul. 71-179, 1971-1 C.B. 58. In Larson and in Rev. Rul. 71-179, the taxpayer cosigned with her child a promissory note, and the taxpayer was jointly and severally liable on the promissory note. In the instant case, Intergraph did not cosign the Overdraft Agreement, and Citibank Tokyo looked primarily to Nihon Intergraph and only secondarily to Intergraph for payment of the overdraft amount.

After considering all of the facts and circumstances, we conclude that the loan from Citibank Tokyo was made to Nihon Intergraph. Intergraph's obligation thereon represented that of a mere guarantor, and Intergraph's payment of the ¥823,943,385 to eliminate the overdraft amount constituted Intergraph's payment

as a guarantor. Accordingly, with respect to its transfer of the ¥823,943,385 into Nihon Intergraph's checking account at Citibank Tokyo, Intergraph is not entitled to the claimed foreign currency loss deduction under section 988, nor to the claimed interest expense deduction under section 163(a).

## Bad Debt Deduction

Alternatively, petitioner argues that Nihon Intergraph's debt obligation to Intergraph that arose on Intergraph's transfer of the ¥823,943,385 into Nihon Intergraph's checking account was worthless and that for 1987 Intergraph should be entitled to a bad debt deduction under section 166 with regard thereto.

Where a taxpayer-guarantor pays the debt obligation of another and where the taxpayer thereby becomes subrogated to the rights of the original creditor and has a right of reimbursement from the original debtor, the taxpayer becomes entitled to a bad debt deduction under section 166(a)(1) only if and when the new debt obligation to the taxpayer-guarantor (namely, the right of reimbursement) becomes worthless. Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Black Gold Energy Corp. v. Commissioner, 99 T.C. 482, 487 (1992), affd. without published opinion 33 F.3d 62 (10th Cir. 1994); Benak v. Commissioner, 77 T.C. 1213, 1218 (1981); see sec. 1.166-9(a), (d), and (e)(2), Income Tax Regs.

Insolvency is only one indication of the worthlessness of a debt obligation. Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176, 1181 (6th Cir. 1980), affg. 68 T.C. 213 (1977); Riss v.

Commissioner, 56 T.C. 388, 408 (1971), affd. in part and remanded 478 F.2d 1160 (8th Cir. 1973). The mere fact that a business is on the decline, that it has failed to make a profit, or that its debt obligation may be difficult to collect does not necessarily justify treating the debt obligation as worthless. Riss v. Commissioner, supra at 407.

The fact that a debtor is able to continue business operations in the face of operating losses and receives continued financial backing of the creditor militates against a finding that the debt obligation has become worthless. See Roth Steel Tube Co. v. Commissioner, supra at 1182; Riss v. Commissioner, supra at 408.

The record in this case does not establish that Nihon Intergraph's debt obligation to Intergraph became worthless in 1987. Although Nihon Intergraph's liabilities may have exceeded its assets during 1985, 1986, and 1987, Nihon Intergraph continued to operate as a going concern, and Intergraph continued to extend its guarantee in support of the overdraft privilege. Even at the time of Intergraph's transfer of the ¥823,943,385 into Nihon Intergraph's checking account, Intergraph intended for Nihon Intergraph to continue operating in Japan, and Intergraph continued to provide funds to Nihon Intergraph.

It has not been established that in 1987 there existed no reasonable expectation that Intergraph would be repaid for

transferring the ¥823,943,385 into Nihon Intergraph's overdraft account.

Petitioner argues that under section 1.166-9(a) and (e)(2), Income Tax Regs., because there was no right of subrogation expressly stated in the Guaranty Agreement, Intergraph should be entitled to the claimed bad debt deduction in 1987, the year in which it made payment under the Guaranty Agreement, regardless of whether Intergraph's right of reimbursement from Nihon Intergraph was worthless. We believe petitioner misreads the referred-to regulations.

Under section 1.166-9(a), Income Tax Regs., the right of a guarantor to claim a bad debt deduction in the year of payment -- regardless of the solvency or financial status of the original debtor -- applies only where the guarantor has no right of subrogation against, and no right of reimbursement from, the original debtor.

Section 1.166-9(a), (d), and (e)(2), Income Tax Regs., properly read, stands for the proposition that where a guarantor does have rights of subrogation and reimbursement from the original debtor (regardless of whether or not these rights are expressly stated in the guaranty agreement), the provisions of section 1.166-9(e)(2), Income Tax Regs., apply, and the guarantor is not entitled to a bad debt deduction until the rights of subrogation and reimbursement are shown to be worthless. See Howell v. Commissioner, 69 F.2d 447, 451 (8th Cir. 1934), affg.

22 B.T.A. 140 (1931); <u>Martin v. Commissioner</u>, 52 T.C. 140, 143 (1969), affd. per curiam 424 F.2d 1368 (9th Cir. 1970); <u>Rietzke v. Commissioner</u>, 40 T.C. 443, 451 (1963); <u>Bradford v. Commissioner</u>, 22 T.C. 1057, 1069 (1954), revd. on other issues 233 F.2d 935 (6th Cir. 1956); <u>Standard Oil Co. v. Commissioner</u>, 7 T.C. 1310, 1323 (1946), supplemented by 11 T.C. 843 (1948).

Petitioner appears to acknowledge in this case that Intergraph had implied rights of subrogation and reimbursement under the Guaranty Agreement. We agree. Intergraph's control of Nihon Intergraph, if nothing else, would appear to provide implied rights of subrogation against and reimbursement from Nihon Intergraph.

Because it has not been established that Intergraph's rights of subrogation and reimbursement from Nihon were worthless in 1987, Intergraph is not entitled to the claimed bad debt deduction under section 166.

<u>Decision will be entered</u>

<u>for respondent</u>.